In the

# United States Court of Appeals

## For the Seventh Circuit

No. 05-4198

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JONG HI BEK,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Indiana, South Bend Division.
No. 03-CR-4—**Allen Sharp**, *Judge.*

ARGUED OCTOBER 30, 2006—DECIDED JULY 6, 2007

Before KANNE, ROVNER, and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* When Dr. Jong Hi Bek arrived at his pain-management clinic in Gary, Indiana each morning, the line of people waiting to get prescription drugs often ran down to the end of the block. Those lines caught the attention of law enforcement, leading to Bek's investigation and eventual arrest for the illegal distribution of prescription drugs. Bek was convicted by a jury on twenty-six counts of conspiring to distribute and distributing controlled substances, and committing health care fraud. On appeal, Bek argues that the jury's verdict was not supported by sufficient evidence, the district court should have excluded certain medical evidence because it was subject to a physician-patient

privilege and protected by the Health Insurance Portability and Accountability Act of 1996 (HIPAA), and the government interfered with his defense and choice of counsel by vindictively prosecuting his attorney. We agree with Bek that the evidence on count nine regarding his treatment of patient Barbara W. was insufficient to support the jury's verdict. But we affirm the district court's judgment on the remaining counts because the evidence was sufficient and the medical records were not protected by any privilege or by HIPAA. Finally, we previously ruled in another case that Bek's counsel was not vindictively prosecuted, so we also reject this argument.

## I. BACKGROUND

Gary Police Department undercover officers, carrying hidden cameras, entered Bek's offices posing as prospective patients. Based on information collected during the undercover operation, a federal magistrate judge issued a warrant to search Bek's medical practice. Ultimately, Bek was charged with twenty-seven counts of conspiracy to distribute controlled substances (21 U.S.C. § 846), distributing controlled substances (21 U.S.C. § 841(a)(1), 18 U.S.C. § 2), and health care fraud (18 U.S.C. §§ 1347, 2).

Bek retained attorney Jerry Jarrett to represent him. However, before Bek's trial began, Jarrett was indicted on money laundering charges. The district court held a hearing to determine whether Jarrett could continue to effectively represent Bek in light of his own legal entanglements, and Bek told the court that he wanted Jarrett to remain his counsel. Some time later, citing financial concerns, Jarrett withdrew from the case. The following day, Bek moved for the dismissal of his indictment, contending that his constitutional rights were infringed by the vindictive prosecution of his former counsel. The

district court denied the motion, ruling it was premature because the case against Jarrett had not been resolved.[1]

At trial, Detective Kirk Banker of the Gary Police Department testified about the investigation that led to Bek's arrest. Banker first entered Bek's clinic posing as a patient. In the presence of Bek's assistant, Richard Faloona, a confidential police informant removed another patient's file from a cabinet in the clinic's waiting area so that Banker could assume that patient's identity. A few minutes later, Faloona asked Banker, the confidential informant, and another patient to step into Bek's office for their examinations. Bek took their blood pressures and weights, and asked them to lift their legs and bend over. After these brief examinations, he gave the unidentified patient a shot in his upper buttocks, prescribed the drugs that each person requested, and pocketed a $50 cash payment from each individual.

After Banker's initial visit, he returned to the clinic several times with other detectives, each time with a similar result: the detectives arrived early in the morning to sign in, Bek performed a short examination on each one, and then prescribed drugs that the detectives requested. Bek always asked for $50 in cash for prescriptions and an additional $50 for refills. He prescribed Schedule III controlled substances, such as Vicodin ES, Vicodin HP, Anadrol-10, and Anadrol-50, and Schedule IV controlled substances, such as Xanax, Diazepam, Adipex-P, Fastin,

---

[1] Another district judge eventually dismissed the case against Jarrett, finding that the government had vindictively prosecuted Jarrett, but we overturned that decision on appeal and reinstated the criminal case. *See United States v. Jarrett*, No. 1:03CR87, 2005 WL 1224684 (N.D. Ind. May 23, 2005), *rev'd*, 447 F.3d 520 (7th Cir. 2006).

Darvocet N, Halcion, and Dalmane.[2] Often, his prescriptions were inconsistent. For instance, Bek prescribed Anadrol, a type of steroid, for Banker because he told Bek that he was lifting weights and wanted to gain weight. During his next visit, Banker said that he wanted to lose weight and, without hesitation, Bek issued a prescription for diet pills.

The government played videotape recordings of the undercover operation and proffered the testimony of other Gary Police Department, Drug Enforcement Agency, and Food and Drug Administration agents to corroborate Banker's account. One of the agents testified that Faloona would tell patients what information to enter on the medical forms and how to ask Bek for the drugs they wanted. The agent said that Faloona told patients that Bek would not prescribe anything stronger than Schedule III and IV drugs, but that "he knew a guy in Valparaiso, Indiana that would." Further, the agent stated that Bek always examined several patients—often of both sexes—at the same time. A female undercover officer noted that Bek gave her a prescription for Viagra even though Viagra does not have any authorized indications for women. Several officers mentioned that Bek never requested past medical records, ordered MRIs, x-rays or other diagnostic tests, or recommended any lifestyle changes.

Some of Bek's former patients also testified, and their experiences matched those of the detectives. One patient explained that Bek's clinic was always crowded because his reputation for willingly prescribing medication attracted individuals from several states away. Many patients said they were often forced to wait for several hours to see Bek (who did not take appointments), and

---

[2] *See* 21 C.F.R. §§ 1308.13 (listing of Schedule III drugs), 1308.14 (listing of Schedule IV drugs).

that Bek administered brief, identical examinations, never involving diagnostic testing, in the presence of other patients of both sexes. Additionally, Bek would not recommend medications, but would only prescribe requested drugs, and he never followed up with his patients to determine whether the drugs were effective.

Patients also testified that Bek did not attend to their specific medical needs. For example, one former patient said that although he had visible scars from heroin injections, Bek never asked about them or required any type of drug testing. Another patient acknowledged that after taking the drugs that Bek prescribed he developed an addiction to pain pills. When the patient's mother called the clinic to complain, Bek refused to see the patient anymore, but did not give him a referral for addiction treatment. A female patient testified that although she was visibly pregnant, Bek never warned her about the effects the drugs might have on her pregnancy.

Faloona, who pled guilty to conspiring to distribute controlled substances during the second day of trial, also testified for the government. Faloona said that because Bek would see about forty patients a day, Faloona was needed to keep order among the patients, to weed out individuals seeking drugs more potent than the Schedule III and IV narcotics that Bek prescribed, and to advise patients about what drugs Bek was willing to prescribe. Faloona also testified that the experiences that the undercover officers reported were typical.

The government also presented expert testimony from a pharmacist who explained that Bek's practices were dangerous and very unusual. The pharmacist explained that Bek should have conducted several diagnostic tests and reviewed patients' medical histories before prescribing drugs such as Vicodin. The expert noted that several of the drugs that Bek routinely prescribed were not

indicated for the uses for which Bek prescribed them. He said that instead of determining the best course of treatment for each patient, Bek used a "menu" of drugs for everyone—"an abuser's dream"—consisting of the same drugs, doses, and intervals. The pharmacist, and the prosecution's expert on the treatment of addiction, concluded that Bek was prescribing controlled drugs without a legitimate medical purpose and outside the scope of medical practice.

To address the charge of health care fraud, representatives from insurance companies also testified. These witnesses explained that their companies sent letters to Bek notifying him that his patients were using insurance to purchase the drugs he prescribed. The letters also notified Bek that some of his patients were being treated by other doctors, and that his treatments were duplicative and involved heavy narcotics use.

In addition, both detectives and patients testified that nearly all of the local pharmacies had become suspicious of Bek's practices and stopped filling his prescription requests. Only two area pharmacies—55th Avenue Pharmacy and Washington Drugs—continued to fill Bek's prescriptions. Pharmacists from both stores pled guilty to illegally distributing controlled substances, and a pharmacist from 55th Avenue Pharmacy testified for the government. He stated that Bek's prescriptions were typically of the same strength and quantity, and that this uniformity enabled the pharmacy to pre-fill bottles with the medications that Bek's patients routinely requested. Business records confirmed that 55th Avenue Pharmacy and Washington Drugs depended upon Bek's business. Over half of the controlled substances dispensed by 55th Avenue Pharmacy during a two-year period were for prescriptions written by Bek. Similarly, 10,000 of the 16,000 prescriptions filled by Washington Drugs during a given period were written by Bek.

Testifying in his own defense, Bek maintained that he conducted thorough examinations of his patients, asking them about their medical histories and injuries. He said that he did not generally send patients for diagnostic tests such as x-rays and MRIs because those tests were too costly for his patients and generally ineffective in identifying pain. He defended his failure to obtain his patients' medical records by explaining that it would be too difficult in his small office to make all patients sign releases for their records. He added that he trusted what patients told him about their histories. Bek also said he would not have prescribed drugs to the undercover agents if they had not lied about their symptoms.

After each side rested, at Bek's request, the district court gave the jury an entrapment instruction based on Bek's claim that the undercover agents induced him to prescribe drugs by lying about their medical conditions. The jury convicted Bek on twenty-six counts (one count was dismissed), and he was sentenced to 41 months' imprisonment on each count (to run concurrently) and two years of supervised release.

## II. ANALYSIS

### A. The Evidence Was Sufficient to Sustain Bek's Convictions on All but Count Nine

On appeal, Bek primarily challenges the sufficiency of the evidence in support of his convictions. After a jury trial, this is a "nearly insurmountable" hurdle. *United States v. Orozco-Vasquez*, 469 F.3d 1101, 1106 (7th Cir. 2006) (citing *United States v. Moore*, 425 F.3d 1061, 1072 (7th Cir. 2005)). When confronted with a sufficiency challenge, "[w]e do not weigh the evidence or assess the credibility of witnesses. Instead, we view the evidence in a light most favorable to the government and reverse

only when there is no evidence, no matter how it is weighed, from which a rational jury could find guilt beyond a reasonable doubt." *Id.* at 1106. We address each of Bek's sufficiency of the evidence arguments in turn.

    1.   Challenges to Bek's Convictions for Illegally Distributing Controlled Substances

       a.   The Evidence Addressed the "Course of Professional Practice" Standard

Bek first contends that the evidence was insufficient to support any of his convictions for the unauthorized distribution of controlled substances because the government's experts testified as to the civil "standard of care" rather than the higher criminal "course of professional practice" standard. Essentially, Bek argues that the government's evidence proved malpractice, not criminal conduct.

At trial, Bek did not object to any of the statements that he now contends addressed an improper standard, so we review this argument for plain error. *See* Fed. R. Crim. P. 52(b); *United States v. Thomas*, 453 F.3d 838, 845 (7th Cir. 2006). To establish plain error, Bek must show "(1) there was an error; (2) the error was plain, clear, or obvious; and (3) the error affected his substantial rights, meaning it must have affected the outcome of the district court proceedings." *Id.* In evaluating the third element, we emphasize the curative effect of the jury instructions as well as the evidence of guilt contained in the entire record. *Id.*

Normally to convict a person charged with violating 21 U.S.C. § 841(a)(1) by distributing a controlled substance, the government must establish that the defendant knowingly possessed with an intent to distribute a controlled substance, and that the defendant knew that

the substance was controlled. *Orozco-Vasquez*, 469 F.3d at 1106. But to convict Bek, a practitioner registered to distribute controlled substances, of violating § 841(a)(1), the government must show that he prescribed controlled substances outside "the course of professional practice." *See United States v. Moore*, 423 U.S. 122, 141 (1975); *United States v. Green*, 511 F.2d 1062, 1067 (7th Cir. 1975); *see also United States v. McIver*, 470 F.3d 550, 564 (4th Cir. 2006).

Bek's concern about whether the jury was misled by the government's evidence is allayed by the jury instructions, which he did not contest. The instructions stated that the government had to prove that Bek distributed controlled substances "other than for a legitimate medical purpose or not within the bounds of professional medical or pharmaceutical practice." The court also specifically instructed the jury that "[i]n determining whether the defendant's conduct was within the bounds of professional medical practice, you should consider the testimony you have heard relating to what has been characterized during trial as the 'norms' of professional practice." We must presume that the jury followed these proper instructions, *see Laxton v. Bartow*, 421 F.3d 565, 573 (7th Cir. 2005), and relied upon the evidence of the norms of professional practice to determine whether Bek's conduct fell outside the "course of professional practice."

Moreover, the evidence addressed and was sufficient to satisfy the criminal standard. Witnesses described practices inconsistent with legitimate medical care: uniform, superficial, and careless medical examinations (e.g., blood pressures taken through clothing); exceedingly poor record-keeping, which one expert called "astonishing" (e.g., reporting temperatures of 98.6° for nearly every patient); and a disregard of blatant signs of drug abuse. The experts testified that Bek prescribed the "same menu" and same dosages of drugs to different patients, regardless of

body build and kidney function. Further, they noted that contrary to accepted medical practice, Bek prescribed multiple medications having the same effects (e.g., two muscle relaxants prescribed at a time), and drugs that are dangerous when taken in combination. And, they concluded that Bek's conduct "was for other than legitimate medical purpose." The jury had more than enough evidence to determine that Bek had a general practice of prescribing controlled substances outside the course of professional conduct.

b.   The Evidence Was Sufficient to Sustain Bek's Convictions with Respect to Deceased Patients Don C. and Roger M., but not Barbara W.

Bek challenges the sufficiency of the evidence regarding his convictions for illegally distributing drugs to three deceased patients—Don C., Roger M., and Barbara W.—because they did not testify at trial. The government introduced the medical records and prescription histories for both Don C. and Roger M.; and Dr. Robert Barkin, a clinical pharmacologist with expertise in pain management, testified that he found no legitimate medical purpose for the prescriptions. Based on the documentary evidence and expert testimony, a rational jury could have found that Bek acted outside the scope of medical practice when he wrote prescriptions for Don C. and Roger M.

However, no expert testified about Barbara W.'s condition or Bek's treatment of her. Nor did the government present her medical records. The jury was therefore unable to assess whether Bek's treatment of Barbara W. was within the "normal course of professional practice." Accordingly, we affirm the convictions for the charges relating to Don C. and Roger M., but reverse on count nine, which pertains to Barbara W.

c.   Sufficient Evidence Supports Bek's Conviction for Illegally Distributing Drugs to Patient Jennifer P.

Bek contends that the evidence was insufficient to support the conviction for illegally distributing drugs to one of his patients, Jennifer P., because she lied to him when she said she had back pain. But, again, the evidence was more than sufficient for a rational jury to conclude that Bek prescribed drugs to Jennifer P. without a legitimate medical purpose. Jennifer P. testified that although she was visibly pregnant, Bek prescribed drugs, such as Xanax and Valium, that can be unsafe when taken during pregnancy without warning her of their dangers. A government expert also testified that particular drugs could be unsafe for a woman who had recently given birth, but Bek prescribed those drugs to Jennifer P. even after she gave birth. Based on this evidence, the jury could rationally conclude that Bek was acting outside the normal course of professional conduct in his dealings with Jennifer P.

d.   A Rational Jury Would Have Rejected Bek's Entrapment Defense

Bek also argues that the evidence did not sufficiently overcome his defense that he was entrapped by the undercover officers when they reported false symptoms. We will not overturn the jury's implicit finding that Bek was not entrapped unless no reasonable juror could have found beyond a reasonable doubt that Bek was not entrapped. *United States v. Jones*, 950 F.2d 1309, 1315 (7th Cir. 1991). To establish that he was entrapped, Bek must prove: (1) that the government induced him to perform the crime, and (2) that he was not predisposed to engage in the criminal conduct. *United States v. Haddad*, 462 F.3d 783, 790 (7th Cir. 2006). If the government demonstrates that the evidence was sufficient to show the defendant's

predisposition to commit the crime, we can properly reject an entrapment defense without analyzing whether the defendant was induced. *United States v. Blassingame,* 197 F.3d 271, 281 (7th Cir. 1999); *United States v. Johnson,* 32 F.3d 304, 308 (7th Cir. 1994). The question of whether a defendant was predisposed to commit a crime focuses on whether the defendant was an "unwary innocent," in contrast to an "unwary criminal" who took advantage of an opportunity to commit a crime. *United States v. Al-Shahin,* 474 F.3d 941, 948 (7th Cir. 2007). In assessing predisposition, we consider:

> (1) the defendant's character or reputation; (2) whether the government initially suggested the criminal activity; (3) whether the defendant engaged in the criminal activity for profit; (4) whether the defendant evidenced a reluctance to commit the offense that was overcome by government persuasion; and (5) the nature of the inducement or persuasion by the government.

*Id.* (citing *Blassingame,* 197 F.3d at 281).

The evidence of Bek's predisposition to distribute unnecessary prescriptions was overwhelming; it need not be repeated here. *See supra* Part II.A.1.a. In fact, it was this predisposition that attracted the attention of drug seekers *and* law enforcement. Because the facts demonstrate that Bek was inclined to prescribe medically unnecessary drugs before law enforcement visited his clinic, the jury properly rejected Bek's entrapment defense.

### 2. Bek's Challenges to His Conviction for Conspiracy to Distribute Controlled Substances Fail

Bek next challenges whether the evidence was sufficient to support his conviction for conspiracy to distribute controlled substances. To prove a conspiracy under 21

U.S.C. § 846, the government must prove "(1) two or more people agreed to commit an unlawful act[;] and (2) the defendant knowingly and intentionally joined in the agreement." *United States v. Johnson*, 437 F.3d 665, 675 (7th Cir. 2006) (quoting *United States v. Gardner*, 238 F.3d 878, 879 (7th Cir. 2001)).

The government presented sufficient evidence of a conspiracy between Bek and Faloona. As detailed above, the evidence certainly established Bek's intention to distribute controlled substances outside the course of professional practice. In addition, during his testimony, Faloona explained in detail his role in the illegal operation, which included keeping order among the patients and screening patients based on the type of drug they sought. And, as shown in a videotape, Faloona told patients what to say to Bek to get him to write a prescription for the drugs they wanted. He also suggested to the patients the medications that they should request and helped them answer questions at the time of examination. Moreover, when Faloona agreed to plead guilty to conspiring with Bek to violate the Controlled Substances Act, he admitted that he believed that he was involved in a conspiracy. Given this evidence, a rational jury could certainly believe that Bek and Faloona conspired to unlawfully distribute controlled substances.

   3.   Bek's Challenge to His Conviction for Committing or Aiding and Abetting Health Care Fraud Is Unconvincing.

Bek also argues that the evidence was not sufficient to support his conviction for committing or aiding and abetting health care fraud. To commit health care fraud, a defendant must

> knowingly and willfully execute[ ], or attempt[ ] to execute, a scheme or artifice . . . (1) to defraud any health care benefit program; or (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program . . . in connection with the delivery of or payment for health care benefits, items, or services . . . .

18 U.S.C. § 1347; *United States v. Davis*, 471 F.3d 783, 785 n.1 (7th Cir. 2006).

Bek claims that he could not have committed or aided and abetted health care fraud because he did not know that his patients were using health insurance to pay for their prescriptions. We disagree. An employee from a pharmacy benefit company testified that her employer sent Bek a letter telling him that the company had paid to fill some of the prescriptions he issued and that "there is potential over-utilization for controlled substances." Bek did not contradict this testimony or argue that he did not receive or read these letters. A rational jury could conclude from this testimony that Bek was aware that he prescribed unnecessary medication and that the health care benefit programs would ultimately pay some (or all) of the costs of those medically unnecessary drugs.

B.  The District Court Did Not Abuse Its Discretion in Admitting the Medical Records

Bek also contends that the district court erred by admitting patient medical information and records because they were protected by both a doctor-patient privilege and a privacy interest created under the Health Insurance Portability and Accountability Act of 1996 (HIPAA), Pub. L. No. 104-191, 110 Stat. 1936. He main-

tains that the government was required to acquire patient waivers before submitting any medical records.

"In reviewing the district court's admission of allegedly privileged evidence, we apply the deferential abuse of discretion standard." *Patterson v. Caterpillar, Inc.*, 70 F.3d 503, 506 (7th Cir. 1995); *see also United States v. Gray*, 410 F.3d 338, 344 (7th Cir. 2005). Under an abuse of discretion standard, "we will not find error unless the court's decision is based on an erroneous conclusion of law or the record contains no evidence on which the court rationally could have based its decision or the supposed facts which the court found are clearly erroneous." *Young v. James Green Mgmt., Inc.*, 327 F.3d 616, 621 (7th Cir. 2003) (quoting *Van Stan v. Fancy Colours & Co.*, 125 F.3d 563, 570 (7th Cir. 1997)).

Bek cannot establish that the medical records were subject to any privilege of confidentiality. Federal common law has not historically recognized a privilege between patients and physicians. *Northwestern Mem'l Hosp. v. Ashcroft*, 362 F.3d 923, 926 (7th Cir. 2004) ("[T]he evidentiary privileges that are applicable to federal-question suits are given not by state law but by federal law, Fed. R. Evid. 501, which does not recognize a physician-patient (or hospital-patient) privilege."); *see also Whalen v. Roe*, 429 U.S. 589, 602 n.28 (1977) ("The physician-patient evidentiary privilege is unknown to the common law."). Bek acknowledges this shortcoming in his argument, but contends that we should find such a privilege here. He relies on *Jaffee v. Redmond*, 518 U.S. 1 (1996), in which the Supreme Court recognized a privilege between a psychotherapist and a patient and noted that under Rule 501 of the Federal Rules of Evidence, federal courts may define new privileges. *Id.* at 8, 10. But we can find no circuit authority in support of a physician-patient privilege, even after *Jaffee*. Indeed, in a decision issued after

*Jaffee*, we declined to recognize such a privilege, *see Northwestern Mem'l Hosp.*, 362 F.3d at 926, and we can find no reason to create one now.

Additionally, in this context, HIPAA did not require patient authorization of the medical record disclosures. As we have previously indicated, HIPAA did not give rise to a physician-patient or medical records privilege. *See Northwestern Mem'l Hosp.*, 362 F.3d at 926 ("We do not think HIPAA is rightly understood as an Act of Congress that creates a privilege."). It did, however, "create a procedure for obtaining authority to use medical records in litigation." *Id.* In this case, none of HIPAA's requirements regarding disclosures of patient information was transgressed.

Although in many instances HIPAA requires that "covered entities" obtain patient authorization before disclosing protected health information, *see* 45 C.F.R. § 164.508(a), exceptions apply. Specifically, under certain conditions, "covered entities," which include "health care provider[s] who transmit[ ] any health information in electronic form," *id.* § 160.103, may disclose protected information without patient authorization "for a law enforcement purpose to a law enforcement official . . . ." *Id.* § 164.512(f). These conditions include instances when the information is subject to a "court order or court-ordered warrant, or a subpoena or summons issued by a judicial officer." *Id.* § 164.512(f)(1)(ii)(A). Here, Food and Drug Administration agents obtained a warrant from a magistrate judge before seizing any of Bek's records. Once the documents were seized, the agents were allowed under HIPAA to disclose (without patient authorization) the medical records in a judicial proceeding, provided that the court entered a protective order that (1) prohibited the parties from disclosing the records outside the confines of the litigation, and (2) required that the records

be returned to the covered entity or destroyed at the end of the litigation. *See id*. § 164.512(e)(1)(ii), (iv), (v). The district court entered an order that satisfied these requirements. Therefore, admission of the medical record evidence did not violate a privilege of confidentiality or HIPAA, or constitute an abuse of discretion.

## C.   Bek's Vindictive Prosecution Argument Falls Short

Finally, Bek argues that the government vindictively prosecuted his original attorney, Jerry Jarrett, in retaliation for Jarrett's successful representation of Bek (the government dropped a murder charge it initially brought against Bek). Bek claims the government's prosecution of Jarrett interfered with Bek's defense and deprived Bek of his constitutional right to choose his own counsel. Bek, in part, relied on another district court's finding that prosecutors had charged Jarrett vindictively to force him to withdraw from his representation of Bek. *United States v. Jarrett*, No. 1:03CR87, 2005 WL 1224684 (N.D. Ind. May 23, 2005). But after Bek filed his brief in this case, we ruled in the appeal of Jarrett's case that the prosecutor's conduct was not motivated by vindictiveness. *See United States v. Jarrett*, 447 F.3d 520, 531 (7th Cir. 2006).

Moreover, even if Jarrett was subjected to vindictive prosecution, Bek cannot show that Jarrett's prosecution actually prompted Jarrett to withdraw from the representation. Even after Jarrett was indicted, he continued to represent Bek. According to Jarrett's motion to withdraw, he withdrew only because Bek "decided to terminate counsel's employment due to financial concerns." We therefore reject Bek's vindictive prosecution argument.

### III.  CONCLUSION

For the reasons detailed above, we REVERSE Bek's conviction on count nine relating to Barbara W., but AFFIRM his conviction on all other counts.

A true Copy:

Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*