# In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-3626

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ROGER A. PELLMANN,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 2:10-CR-00014-CNC-1—**Charles N. Clevert, Jr.**, *Chief Judge.*

ARGUED JUNE 1, 2011—DECIDED FEBRUARY 10, 2012

Before FLAUM and SYKES, *Circuit Judges*, and CONLEY, *District Judge.*[*]

CONLEY, *District Judge.* Roger A. Pellmann was convicted by a jury of (1) distributing fentanyl, a Schedule II narcotic controlled substance in violation of 21 U.S.C.

---

[*] The Honorable William M. Conley, United States District Court for the Western District of Wisconsin, sitting by designation.

§ 841(a)(1); and (2) obtaining morphine by misrepresentation, fraud, and deception in violation of 21 U.S.C. § 843(a)(3). On appeal, Pellmann argues that his conviction should be overturned because the government failed to introduce expert testimony to prove that he distributed Schedule II narcotics outside of his professional practice and for other than legitimate medical purposes. Pellmann also maintains that the district court improperly enhanced his sentence for obstruction of justice. Because the jury's verdict is supported by overwhelming evidence and the district court's sentencing enhancement based on Pellmann's having lied to the U.S. Drug Enforcement Administration ("DEA") agents is more than reasonable under the circumstances, we affirm the district court's judgment.

**I**

In considering trial evidence, the court gives "a jury verdict great deference and will uphold the verdict if, viewing the evidence in the light most favorable to the government, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *See United States v. Baker*, 655 F.3d 677, 684 (7th Cir. 2011) (citing *United States v. Hicks*, 368 F.3d 801, 804-05 (7th Cir. 2004)). It is not our role to "re-weigh the evidence or second guess the jury's credibility determinations." *Baker*, 655 F.3d at 684 (citing *United States v. Stevens*, 453 F.3d 963, 965 (7th Cir. 2006)). The evidence admitted at trial supports the following findings by the jury.

## A. Background

Pellmann was a medical doctor licensed to practice in Wisconsin, and board certified in radiology, interventional radiology, and phlebology (the study and treatment of vein disease). During the previous decade, Pellmann owned and operated two businesses: the Pellmann Center for Medical Imaging in New Berlin, Wisconsin, which provided imaging services, such as MRI and CT scans; and the Pellmann-Evans Vein and Laser Clinic in Germantown, Wisconsin, which provided treatments for varicose veins. As a practicing physician, Pellmann was also registered with the DEA, which authorized him to order, prescribe and administer controlled substances under appropriate circumstances.

As part of his practice at his medical clinics, Pellmann administered fentanyl to his patients to treat pain. Like morphine, fentanyl is a Schedule II narcotic pain reliever, but more effective because it is short-acting and has 100 times the potency. Pellmann's staff testified at trial that a patient would typically receive one vial of fentanyl during a procedure and, at most, three to five vials. From 2005 through 2008, Pellmann ordered no morphine and no more than 260 units of fentanyl per year.

In 2009, these orders changed dramatically. That year alone, Pellmann ordered substantial quantities of morphine and more than 7,000 dosage units of fentanyl, which represents a more than 27-fold increase over purchases in prior years. Unsurprisingly, this sharp increase

caught the attention of the DEA, prompting an investigation.

### B. DEA Investigation

As part of its investigation, the DEA obtained records of prescriptions for controlled substances issued by Pellmann and filled at certain pharmacies in Wisconsin between 2007 and 2009. These records revealed that Pellmann was issuing a large percentage of his prescriptions to Jacquelynn Evans, a registered nurse.

Evans had begun working for Pellmann in September 2005, first as a nurse and eventually as vice president of the vein clinic. Evans considered Pellmann her primary care physician, even though he was a radiologist. Over the years, Pellmann treated Evans for sinusitis, bronchitis, gastroenteritis, low back pain, and migraine headaches, and also treated members of her family. Evans testified she loved Pellmann and considered him her best friend.

On November 3, 2009, federal agents collected discarded trash from Evans' residence. In the trash, agents found 421 empty vials of fentanyl, 13 empty vials of morphine, an empty 20-milliliter bottle of morphine, packaging materials and inserts for fentanyl and morphine, used syringes, needles, band-aids, and alcohol swabs. Based on this evidence, the DEA obtained search warrants for Pellmann's vein clinic and Evans' residence, which they executed on November 12, 2009.

Evans' home revealed more of the same. Agents found a variety of needles, syringes, other medical supplies,

packaging materials, and full and empty vials of fentanyl and morphine. The vials were found in numerous locations throughout her home: scattered on a desk in her study, in an overnight bag also in the study, in the kitchen, in the trash in the garage, in Evans' car, in the master bedroom and bathroom, and in Evans' purse. In a bathroom closet, agents discovered two large plastic containers filled with used needles and hundreds, if not thousands, of empty fentanyl and morphine vials.

At the vein clinic, agents found dispensing logs for fentanyl, but no records reflecting Pellmann's acquisition or use of morphine. The agents also located seven unopened vials of fentanyl and no morphine.

DEA agents also interviewed Pellmann, during which he eventually acknowledged that Evans was his patient and that he had been treating her with fentanyl and morphine. Pellmann reported giving Evans fentanyl every day, increasing over time from 10 to 20 vials to 50 vials per day, as well as morphine. Pellmann stated that he delivered and administered fentanyl and morphine at Evans' home and at his house. Pellmann also acknowledged that he had not documented his treatment of Evans, nor were the agents able to uncover any records reflecting Pellmann's treatment of Evans at the clinic. During this same interview, Pellmann also told the agents that he was injecting himself with morphine to treat a neck injury.

After obtaining Pellmann's consent, the agents proceeded to search Pellmann's car and home. Inside the car,

the agents recovered a large box containing 600 vials of fentanyl and 10 boxes of morphine. When asked why the drugs were in his car, Pellmann reported that he was transporting them to his home for safekeeping after a recent theft at the clinic, and specifically denied that he was delivering them to Evans' home.

Throughout Pellmann's home, agents found numerous bottles and vials of fentanyl and morphine, both full and empty, including trays of vials in his bedroom and bathroom. In and around the sink in Pellmann's bathroom, agents found used and unused syringes with needles, alcohol wipes, and an elastic armband, presumably used to expose veins for injections. Agents also found two nails above Pellmann's bed, which at trial Pellmann and Evans both testified were used to hang bags of saline solution to facilitate Evans' use of fentanyl and morphine.

On November 17, 2009, the DEA agents again collected garbage from outside of Evans' house and recovered approximately 100 empty fentanyl vials, empty morphine vials, used syringes, and packaging material for fentanyl. On January 12, 2010, one of the nurses employed at the vein clinic contacted the DEA to report her discovery of empty fentanyl vials in the non-medical trash, along with other medical supplies, including packaging trays for fentanyl, used syringes and bloody gauze.

On January 14, 2010, DEA agents searched Pellmann's vein clinic and arrested him. At that time, agents found 144 unopened vials of fentanyl, although the clinic's

records indicated that there should have been 371 vials. Agents also found empty fentanyl vials in the trash in Pellmann's personal bathroom at the clinic.

Pellmann was charged with multiple violations of 21 U.S.C. §§ 841(a)(1) and 843(a)(3). After his initial appearance, Pellmann was released on bond. Among the conditions of his release, Pellmann was not to possess Schedule II controlled substances, employ Evans, or prescribe any drugs for her. Immediately following his release, however, Evans picked Pellmann up from the courthouse and the two spent the night at a hotel, where Pellmann administered medications to Evans. Pellmann admitted that he provided Evans with midazolam, a non-Schedule II controlled substance. Evans believed he administered fentanyl.

### C. Additional Evidence at Trial

At trial, Evans testified that Pellmann began administering fentanyl in March 2009 to treat severe mouth pain stemming from a fractured tooth, which Pellmann diagnosed as trigeminal neuralgia and described as the "suicide disease," because of the high rates of suicide associated with the condition. Pellmann administered fentanyl, and later morphine, to Evans; he also provided fentanyl for Evans to administer to herself.

One of the agents testified at trial that, during the investigation, Pellmann explained Evans suffered from severe dental problems and that Evans' oral surgeon, Dr. Guy Jensen, had asked Pellmann to handle Evans'

pain management. This directly contradicted Jensen's trial testimony that Evans never disclosed that she was taking fentanyl; that Evans did not exhibit symptoms of trigeminal neuralgia; that he did not know Pellmann; and that he had never discussed Evans' pain management with him or with anyone else. At trial, Pellmann acknowledged not speaking with Jensen about Evan's condition, claiming that he either misspoke during his interview with the agent or the agent misheard him.

After the DEA searched Evans' home in November 2009, Evans sought treatment for opiate dependency and withdrawal from fentanyl and morphine. As part of this treatment, her psychiatrist prescribed Suboxone, which blocks the effect of fentanyl and diminishes cravings. At trial, Pellmann acknowledged that he continued to give Evans daily doses of fentanyl while she was being treated with Suboxone.

Pellmann testified at trial that he treated Evans, as well as members of her family, for a variety of medical conditions. In 2009, Pellmann began treating Evans for pain, which he diagnosed as resulting from trigeminal neuralgia. After Vicodin and fentanyl patches proved unsuccessful, Pellmann began using fentanyl vials and later morphine. Pellmann acknowledged that he did not document his diagnosis or treatments.

Current and former employees of Pellmann's vein clinic also testified about the use of controlled substances at the clinic. Specifically, Melissa McGrath, a registered nurse who worked at the clinic from March 2008 through February 2010, and Wendy Kaehny, the supervisor of the

vein and laser practice since 2003, both testified that fentanyl was used during vein procedures and that all use was documented in paper charts. Esperanza Hall, the IT manager with no medical experience, testified that on two occasions she assisted Pellmann in inserting a PICC (which stands for peripherally inserted central catheter) line into Evans and that she delivered medicine from Pellmann to Evans at her home. After one such delivery, Evans paid Hall $100, which Hall testified was for gas and mileage.

Evans testified that Pellmann initially gave her one to two vials of fentanyl per injection from one to three times per week, slowly increasing over time. Pellmann testified that virtually from the start of his treatment of Evans, he was giving her 20 injections of fentanyl on a daily basis, and that the dosage increased from two vials to five vials per injection from mid-March 2009 to November 2009. Starting in May 2009, Pellmann testified that he began substituting morphine for fentanyl at night. Pellmann explained these injections were administered at Evans' or his house so that he could monitor Evans due to the risk of respiratory distress associated with such medications.

At trial, the government chose not to offer any expert testimony as to the appropriate standard of care or medical practice for treating trigeminal neuralgia or Evans' complaints of pain. On June 4, 2010, the jury returned a verdict of guilty on all counts and the district court scheduled a sentencing hearing for September 17, 2010.

**D. Sentencing**

The presentence report recommended a base offense level of 18, a two-level increase under U.S.S.G. § 3B1.3 for Pellmann's use of a special skill as a physician to facilitate his offenses, and an additional two-level increase under U.S.S.G. § 3C1.1 based on Pellmann's efforts to obstruct the government's investigation and prosecution, for a total base offense level of 22. Pellmann objected to the base offense level and the proposed increase for obstruction of justice.

At an initial sentencing hearing on September 17, 2010, the court indicated that it was not yet prepared to address the issue of whether Pellmann's offense level should be increased for obstruction of justice. But at the continuation of the sentencing hearing on October 12, 2010, the court found that Pellmann had attempted to obstruct the government's investigation and prosecution by intentionally providing false information to federal agents. Specifically, the district court found that Pellmann's statements to DEA agents during the investigation concerning Dr. Jensen "were intentionally false and sufficient in and of themselves to warrant a finding that the defendant obstructed justice in this matter." The court also noted other evidence of obstruction, including Pellmann's false statement to agents that drugs had been stolen from his office in order to try to justify the storing of fentanyl in his car. The district court found that the trial testimony established that Pellmann and Evans "were utilizing fentanyl away from the clinic, and that the drugs that were in the

car were there for the primary purpose of feeding Ms. Evans' addiction."

With an adjusted offense level of 22 and a Criminal History Category of I, the advisory guideline range was 41 to 52 months. The court sentenced Pellmann to 48 months on each count, to run concurrently, and to a subsequent three-year period of supervised release.

## II

On appeal, Pellmann challenges his conviction under 21 U.S.C. § 841(a)(1), which provides that it is "unlawful for any person knowingly or intentionally . . . to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance."[1] Typically, to convict a person of violating 21

---

[1] Pellmann also purports to challenge, but fails to develop an argument for overturning, his conviction under § 843(a)(3), which concerns knowingly obtaining morphine sulfate by misrepresentation, fraud and deception. As a result, neither side addresses this statute, citing only to cases discussing proof sufficient to convict a physician under § 841(a)(1). The court will not separately address this count of conviction further since (1) proof that Pellmann was prescribing morphine outside the scope of professional conduct coincided with proof as to fentanyl, as did proof that Pellmann acted for other than a legitimate medical purpose; (2) the proof as to heroin prescription was, if anything, even stronger, given Pellmann's never prescribing it in his practice; and (3) Pellmann failed

(continued...)

U.S.C. § 841(a)(1), the government must establish that the defendant knowingly possessed with an intent to distribute a controlled substance, and that the defendant knew that the substance was controlled. *See United States v. Bek*, 493 F.3d 790, 798 (7th Cir. 2007). Where the defendant is a physician, however, the government must also show that he prescribed controlled substances (1) "outside the course of professional practice" and (2) without a "legitimate medical purpose." *Id.*; *see also United States v. Chube*, 538 F.3d 693, 697-98 (7th Cir. 2008); 21 C.F.R. § 1306.04(a) ("A prescription for a controlled substance[,] to be effective[,] must be issued for a legitimate medical purpose and by an individual practitioner acting in the usual course of his professional practice."). Pellmann argues that his convictions must be overturned because the government failed to introduce expert testimony to prove either of these facts. The government correctly characterizes Pellmann's argument as a challenge to the sufficiency of evidence supporting his conviction.

Other courts have considered the requirement of expert testimony in cases where physician-defendants are charged with violating § 841(a)(1) and have uniformly held that such testimony is not required, assuming there is other evidence, including lay testimony, that the defendant acted outside of the scope of his or her usual

---

[1] (...continued)

to develop any separate argument on appeal challenging his conviction under § 843(a)(3).

course of professional practice and for other than a legitimate medical purpose. For example, in *United States v. Armstrong*, the Fifth Circuit considered a physician-defendant's nearly identical challenge to his conviction based on the government's claimed failure to present expert testimony. 550 F.3d 382 (5th Cir. 2008), *overruled on other grounds by United States v. Balleza*, 613 F.3d 432, 433 (5th Cir. 2010). In rejecting this argument, the court explained:

> While expert testimony may be both permissible and useful, a jury can reasonably find that a doctor prescribed controlled substances not in the usual course of professional practice or for other than a legitimate medical purpose from adequate lay witness evidence surrounding the facts and circumstances of the prescriptions.

*Id.* at 389; *see also United States v. Word*, 806 F.2d 658, 663-64 (6th Cir. 1986) (affirming conviction of physician and finding expert testimony not required given facts of case); *United States v. Smurthwaite*, 590 F.2d 889, 892 (10th Cir. 1979) (finding expert testimony not required to support conviction of physician-defendants).

Pellmann argues that *Armstrong* and the other cases are distinguishable from the facts here, because they all involved physicians who peddled drugs to multiple patients. In *Armstrong*, the government presented evidence of an extremely high volume of patients (as many as 300 patients in a four- to six-hour period), short durations of patient visits, lack of meaningful physical examination, false documentation, pre-printed medical comments, a cash-only payment policy and a lack of

individualization of prescriptions, which were prepared in advance of the appointment and required only the doctor's signature. 550 F.3d at 389. Similarly, in *Smurthwaite*, patient visits lasted less than five minutes with little or no physical examination, patients were charged per prescription, and the physician-defendant had knowledge that the prescription medication was not used as intended. 590 F.2d at 892.

Obviously, the facts here do not fall within these more common "drug pusher" cases: Pellmann was not charged with prescribing controlled substances to hundreds of patients, conducting perfunctory examinations, or issuing cookie-cutter prescriptions. Still, there was certainly ample evidence, considered together, for a reasonable jury to determine that Pellmann acted outside of his professional practice and not for a legitimate medical purpose, including: (1) during 2009, Pellmann ordered *30 times* his previous average, annual needs of fentanyl and morphine for his entire practice, all of the excess going to Evans; (2) Pellmann regularly administered fentanyl and morphine to Evans at her home and at Pellmann's home, both of which resembled (for lack of a better description) drug houses; (3) Pellmann maintained no records of distribution of drugs to Evans or his treatment of her, including his apparently concocted diagnosis of trigeminal neuralgia; (4) Pellmann's treatment of Evans was wholly outside his use of

fentanyl and morphine in his professional practice;[2] (5) Pellmann's employees were kept in the dark about his claimed treatment of Evans; and (6) following his arrest and initial arraignment, Pellmann again took Evans to a hotel and administered drugs in direct violation of a court order. As detailed in Part I of this opinion, this evidence is not only sufficient to support the jury's conviction, it is overwhelming.

---

[2] The DEA conducted an audit of Pellmann's acquisition and use of fentanyl and morphine during 2009. In a nine-month period, from February 26, 2009 through November 17, 2009, pharmaceutical records revealed that Pellmann made 40 separate purchases of fentanyl and obtained a total of *15,090* 2-milliliter vials. Records from Pellmann's clinic revealed that he used *507* vials of fentanyl at his clinic during that same period—an amount roughly equivalent to double his maximum annual use in any of the prior four years. Even after accounting for the 600 vials discovered in his car, Pellmann had no records explaining his use of 13,470 vials of fentanyl. A second audit was conducted from the date of the initial search, November 19, 2009, until the date of Pellmann's arrest, January 14, 2010. That audit revealed that Pellmann failed to account for 124 vials of fentanyl and that the majority of fentanyl that was accounted for had been administered to Evans. An audit of Pellmann's purchases of morphine from April 28, 2009 through December 2, 2009, was just as damning. Pellmann made 30 purchases of morphine for a total purchase of 64,150 milligrams. Other than the morphine found in Pellmann's car, DEA agents could not account for *any* of the morphine purchased during this period. Indeed, he had purchased *none* for his medical practice in the past four years.

Pellmann cites to two decisions from our circuit in support of his argument to the contrary, but in neither did this court hold that expert testimony was required. In *United States v. Bek*, the government presented lay evidence that the physician-defendant Bek acted outside of the normal course of his professional practice, along with expert testimony by a pharmacist who "explained that Bek's practices were dangerous and very unusual." 493 F.3d at 797-99. The court reversed the defendant's conviction with respect to a deceased patient, Barbara W., because "no expert testified about Barbara W.'s condition or Bek's treatment of her. Nor did the government present her medical records." 493 F.3d at 799. Based on an utter lack of *any* evidence regarding the patient and Bek's treatment of her, not a lack of *expert* testimony, the court reversed the conviction as to this one patient, concluding that the jury was "unable to assess whether Bek's treatment of Barbara W. was within the 'normal course of professional conduct.'" *Id.*

In *United States v. Chube*, the government proffered expert testimony about the usual standard of care. In affirming the physician-defendant's conviction, however, the *Chube* court did not hold that expert testimony was required to sustain the conviction any more than the court in *Bek*. Rather, the court considered whether expert testimony about a civil standard of care might have muddied the question of "legality." 538 F.3d at 698-99. Indeed, the court favorably reviewed an instruction that the jury "may consider all of the evidence of cir-

cumstances surrounding the prescription of the substance in question." *Id.* at 699.[3]

Just as did the Fifth Circuit in *Armstrong*, we find that—while expert testimony might have aided the jury and the district court would not have erred by admitting such testimony if offered by either party—the government was not required to present expert testimony, especially in light of overwhelming evidence of Pellmann's unprecedented and undocumented prescriptions of profoundly addicting and potent painkillers, which he personally administered in multiple, private houses and hotel rooms Pellmann shared with Evans for long-term treatment of a condition he was unqualified to diagnose and did not treat in his own area of practice. Similarly, while Pellmann was allowed to opine that Evans' claimed medical condition justified this drug regimen, the jury had an ample evidentiary basis to reject it, even without contrary expert opinion.

---

[3] Perhaps realizing the lack of legal precedent for his principal position, Pellmann also suggests that the district court impermissibly restricted testimony on the issue of whether Pellmann was operating within the scope of his professional practice and with a legitimate medical purpose. But this is not so. Pellmann was free to opine, and he actually testified, that Evans was suffering from trigeminal neuralgia and that his treatment of her condition was appropriate. That the jury obviously rejected Pellmann's testimony in light of the government's overwhelming evidence to the contrary is hardly surprising and, in any event, something the jury was permitted to do.

**III**

Pellmann's challenge to the district court's enhancement of his sentence for obstruction of justice also lacks merit. The district court increased his offense level under U.S.S.G. § 3C1.1 after finding that Pellmann intentionally provided false information to federal agents during the investigation. Section 3C1.1 calls for a two-level increase to a defendant's offense level if the defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice, with respect to the investigation, prosecution or sentencing of the instant offense of conviction." U.S.S.G. § 3C1.1. "[P]roviding a materially false statement to a law enforcement officer that significantly obstructed or impeded the official investigation or prosecution of the instant offense" is included in the types of conduct to which this enhancement applies. U.S.S.G. § 3C1.1, comment 4(D).

We review the district court's factual findings underpinning its decision to apply the obstruction enhancement for clear error. *United States v. DeLeon*, 603 F.3d 397, 403 (7th Cir. 2010). We review *de novo* the district court's determination that the facts adequately support the enhancement. *United States v. Anderson*, 580 F.3d 639, 648 (7th Cir. 2009).

While the presentence report listed other examples of false statements made by Pellmann to investigators, as well as Pellmann's false testimony at trial, the district court focused primarily on Pellmann's statement to DEA agents during the investigation about his contact with Evans' oral surgeon, Dr. Jensen, regarding management

of Evans' pain. The district court found that Pellmann's statement was false, that in making the statement he intended to obstruct the investigation, and that this false statement was sufficient to justify application of a two-level enhancement in and of itself.

The district court was obviously in the best position to judge the credibility of Pellmann's claim that he either (1) innocently misspoke when he told the DEA agent about his exchange with Dr. Jensen or (2) the agent misheard him.[4] For this reason, we have little trouble concluding the district court did not clearly err in finding that Pellmann intentionally lied to a DEA agent in order to obstruct his investigation. Indeed, since Dr. Jensen denied even knowing Pellmann, much less diagnosing Evans for trigeminal neuralgia and discussing with Pellmann her resulting need for pain management, it is far more plausible that Pellmann was intentionally lying about his supposed conversations with Dr. Jensen to justify his blatant misconduct, than that he "innocently misspoke" or was misheard. Based on these factual findings, the district court's application of an enhancement for obstruction of justice under U.S.S.G. § 3C1.1 and 18 U.S.C. § 3553(a) was wholly appropriate.

The judgment of the district court is, therefore, AFFIRMED.

---

[4] Pellmann maintained at trial that it was another of Evans' dentists who made the diagnosis.