# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

November 21, 2008

Charles R. Fulbruge III
Clerk

No. 07-30286

UNITED STATES OF AMERICA

Plaintiff-Appellee

v.

CHERLYN R. ARMSTRONG, also known as Cherlyn Cookie Armstrong, also known as Cherlyn Cookie Armstrong-Scherer, also known as Cherlyn Cookie Prejean, also known as Cherlyn Armstrong Scherer Prejean; DR. SUZETTE CULLINS

Defendants-Appellants

Appeals from the United States
District Court for the Eastern District of Louisiana

Before HIGGINBOTHAM, STEWART, and SOUTHWICK, Circuit Judges.

CARL E. STEWART, Circuit Judge:

Defendants Cherlyn Armstrong Scherer Prejean ("Armstrong"), the Scherer Corporate Defendants,[1] and Dr. Suzette Cullins ("Dr. Cullins" and collectively, the "Defendants") were convicted following a jury trial of offenses relating to a scheme to illegally dispense certain controlled substances in

---

[1] The Scherer Corporate Defendants are the following entities: Scherer Physicians Weight Loss Center, Inc.; Scherer's Medical Center, Inc.; Scherer's Slidell Medical Center, L.L.C.; Scherer's Gretna Medical Center, L.L.C.; Mia's Pharmacy, L.L.C.; Mia's Pharmacy Slidell, L.L.C.; Bella Mia Holdings, L.L.C.; C.C. Armstrong Co., L.L.C.; and the Ballard Co., L.L.C.

violation of the Controlled Substances Act (the "CSA"), 21 U.S.C. §§ 846, 841(a). Armstrong and Dr. Cullins appeal from their convictions under the CSA. Armstrong also challenges certain evidentiary rulings that she argues tainted her conviction for conspiracy to commit money laundering. Dr. Cullins appeals the reasonableness of her sentence. For the following reasons, we AFFIRM in part, REVERSE in part, and REMAND to the district court.

## FACTUAL AND PROCEDURAL BACKGROUND

Armstrong, a Registered Nurse, was the owner and operator of weight loss and pain management clinics and pharmacies, located in Slidell, Metairie, and, at various times, Harvey or Gretna, Louisiana. Her family members provided continual and active assistance in their operation. From approximately January 1998 to August 2000, the clinics' focus was on weight loss, and prescriptions were given for controlled-substance weight-loss drugs. In or around August 2000, the focus changed to pain management, and prescriptions were given for controlled-substance pain management drugs. The three drugs ("trinity drugs") most often prescribed at the clinics and dispensed at the pharmacies during this time included: (1) Hydrocodone;[2] (2) Alprazolam or Diazepam;[3] (3) and Carisoprodol.[4] Armstrong's pharmacies only stocked and sold the generic

---

[2] Hydrocodone is a Schedule III controlled substance sold under the names of Lortab, Lorcet, and Vicodin.

[3] Alprazolam is a Schedule IV controlled substance sold under the name Xanaz; Diazepam is a Schedule IV controlled substance sold under the name of Valium.

[4] Carisoprodol is a muscle relaxer sold under the name Soma and is not a controlled substance.

versions of the trinity drugs. The drugs have a high abuse potential and a high illegal street market value.

After an investigation, agents of the Drug Enforcement Agency ("DEA") shut the clinics down in April 2005. Armstrong, the various corporate entities which she established, including the pharmacies and clinics ("Corporate Defendants"), and three physicians employed at the clinics[5] were charged with knowingly and intentionally conspiring to dispense Schedule III and IV controlled substances in violation of the CSA. See 21 U.S.C. § 846. A superseding indictment was later returned charging an additional twenty-six specific instances (counts 2-27) in which Armstrong, the clinics, and the pharmacies, aided and abetted by persons known and unknown–including Drs. Cullins, Guenther, and DeLoach–knowingly and intentionally dispensed controlled substances, outside the scope of professional practice and not for a legitimate medical purpose, in violation of 21 U.S.C. § 841(a)[6] and 18 U.S.C. § 2.

---

[5] Dr. Joseph Guenther, Dr. Betty DeLoach, and Dr. Cullins.

[6] Section 841(a) provides:

> (a) Unlawful acts. Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally–
>
> > (1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance[.]

21 U.S.C. § 841(a) (emphasis added). Those authorized by the CSA are described in § 822:

> Persons registered by the Attorney General under this subchapter to . . . dispense controlled substances . . . are authorized to . . . dispense such substances or chemicals (including any such activity in the conduct of the research) to the extent authorized by their registration and in conformity with the other provisions of this subchapter.

21 U.S.C. § 822(b) (emphasis added). And finally, 21 C.F.R. § 1306.04, which proscribes the

These alleged instances involved either an undercover DEA agent as a patient or an actual patient as an informant at the direction of the DEA. Lastly, Armstrong and the Corporate Defendants were charged with conspiring to launder money involving the proceeds of the illegal drug activity, in violation of 18 U.S.C. § 1956(h) (count 28).

Prior to trial, two of the co-defendant physicians named in the superseding indictment, Dr. Guenther and Dr. DeLoach, pled guilty to various charges. Dr. Guenther pled guilty to all charged counts,[7] and Dr. DeLoach pled guilty to misprision of a felony in violation of 18 U.S.C. § 4. The remaining Defendants –Armstrong, Dr. Cullins, and the Corporate Defendants–proceeded to trial. The jury found all Defendants guilty of the conspiracy charged in count one and various substantive counts charged in counts two through 27 of the superseding

---

conduct of those registered under the CSA to dispense controlled substances, states in relevant part:

> A prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice. The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription. An order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is not a prescriptions within the meaning and intent of section 309 of the Act (21 U.S.C. § 829) and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances.

21 C.F.R. § 1306.04(a) (emphasis added).

[7] Dr. Guenther pled guilty to count one, conspiracy to illegally dispense controlled substances, and counts 13, 16, 21, and 25 for illegal dispensation of controlled substances.

indictment.[8] Armstrong and the Corporate Defendants were also found guilty on count 28, conspiring to commit money laundering.

Following trial, Armstrong and Dr. Cullins filed a motion for judgment of acquittal or in the alternative for a new trial, which was denied. The Government filed sentencing memoranda seeking an upward departure based on injuries to specific victims, including patients, their families, and the community, because these victims were not taken into account by the Sentencing Guidelines. Armstrong and Dr. Cullins responded. At the sentencing hearing, the district court adopted the factual findings and recommendations of the pre-sentencing report ("PSR"). Dr. Cullins did not object to the factual findings of her PSR. The district court sentenced Dr. Cullins to sixty-month sentences for each of her CSA convictions, to be served concurrently. Thereafter, the district court also sentenced Armstrong to sixty-month concurrent sentences for each of her CSA convictions, and a seventy-month concurrent sentence for conspiracy to commit money laundering. Armstrong, Dr. Cullins, and Corporate Defendants timely appealed. This Court dismissed Corporate Defendants' appeal for want of prosecution on August 24, 2007.[9] As a result, this Court reviewed only the appeals of Armstrong and Dr. Cullins (together, the "Appellants").

---

[8] Armstrong was convicted on all counts except counts 2, 18, and 24. Cullins was convicted only on counts 3, 5, 7, 8, and 23.

[9] On June 4, 2007, this Court dismissed Corporate Defendants' appeal for want of prosecution and subsequently reinstated it providing additional time to pay the docketing fees. The appeal was again dismissed for want of prosecution on August 24, 2007.

ILLEGAL DISPENSATION OF CONTROLLED SUBSTANCES

I. Sufficiency of the Evidence

A. Lack of Expert Testimony

Armstrong and Dr. Cullins argue that because the Government failed to present expert testimony regarding what the professional standard of care should be for a physician prescribing controlled substances to chronic pain patients, there was insufficient evidence for the jury to find beyond a reasonable doubt that Appellants' conduct was outside the course of professional conduct.

1. Standard of Review

In evaluating whether the evidence produced at trial is sufficient to support a jury conviction, this Court examines whether a rational jury, viewing the evidence in the light most favorable to the prosecution, could have found the essential elements of the offense to be satisfied beyond a reasonable doubt. See United States v. Miles, 360 F.3d 472, 476-77 (5th Cir. 2004). In reviewing the evidence, all reasonable inferences are drawn in favor of the jury's verdict. Id. This Court does not evaluate whether the jury's verdict was correct, but rather, whether the jury's decision was rational. Id. If the evidence "gives 'equal or nearly equal circumstantial support to a theory of guilt or innocence, we must reverse the conviction, as under these circumstances a reasonable jury must necessarily entertain a reasonable doubt.'" United States v. Rivera, 295 F.3d 461, 466 (5th Cir. 2002) (internal citations omitted).

2. Discussion

The evidence presented at trial, viewed in the light most favorable to the Government, supports the jury's guilty verdicts as to Armstrong and Dr. Cullins on the conspiracy charge under § 846 (count one) and on the substantive

violations under § 841 (counts 2-27). Even without expert testimony, the Government demonstrated at trial that Armstrong and her co-conspirators organized and ran a continuous scheme of delivering controlled substances to a high volume of individuals for profit rather than a valid medical purpose.

Although Armstrong and Dr. Cullins argue that the Government did not meet its evidentiary burden because it did not put on expert testimony, "expert testimony is not always required in order to show that a physician is acting for other than proper medical purposes [in violation of § 841]." United States v. Chin, 795 F.2d 496, 503 (5th Cir. 1986) (citing United States v. Rosen, 582 F.2d 1032, 1037 n.10 (5th Cir. 1978)). While expert testimony may be both permissible and useful, a jury can reasonably find that a doctor prescribed controlled substances not in the usual course of professional practice or for other than a legitimate medical purpose from adequate lay witness evidence surrounding the facts and circumstances of the prescriptions. United States v. Rogers, 609 F.2d 834, 839 (5th Cir. 1980). There are § 841 cases in which the trier of fact does not need outside, specialized knowledge to understand the evidence or determine the facts.[10] See United States v. Word, 806 F.2d 658, 663-64 (6th Cir. 1986) (finding that expert testimony about the usual course of professional conduct and legitimate medical purposes may help a jury, it was not necessary on the facts of the case on appeal); United States v. Smurthwaite, 590 F.2d 889, 892 (10th Cir. 1979) (finding expert testimony unnecessary to prove prescriptions were outside of professional practice where evidence included visits

---

[10] The Federal Rules of Evidence instruct that expert testimony is not automatically admitted, but only when "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or determine a fact issue." FED. R. EVID. 702 (emphasis added).

7

less than five minutes in length, charging patients per prescriptions, little or no physical examination of patients at initial or follow-up visits, and defendant had some knowledge that prescriptions pills were used for parties rather than weight-loss); United States v. Larson, 507 F.2d 385, 387 (9th Cir. 1974) (similar). Jurors have had a wide variety of their own experiences in doctors' care over their lives, thus and expert testimony is not necessarily required for jurors to rationally conclude that seeing patients for as little as two or three minutes before prescribing powerful narcotics is not in the usual course of professional conduct.

There are also undoubtably situations where evidence as to the usual course of professional conduct might be essential proof of the Government's case. But here there is ample evidence of conduct outside the usual course of any professional practice and/or without medical purpose. Specifically, the Government presented evidence of: (1) long-term rather than short-term treatment, which conflicted with the clinics' own medical guidelines regarding chronic pain management;[11] (2) an extremely high volume of patients seen each day (as many as 300 patients in a four-to-six hour time frame); (3) short durations for patient visits;[12] (4) a lack of individualization of the prescriptions;[13]

---

[11] Other clear violations of the clinics' own policies found in the patient files include: failing to conduct drug and urine tests on any patients, refusing to discuss drug addiction with families attempting to intervene, and illegal filling of prescriptions by Armstrong's pharmacies before the issue date on the prescription.

[12] Dr. Cullins wrote 78% of the trinity drug prescriptions for two weeks in January and two days in April 2005, working only fifty-four hours and averaging no more than ninety-nine seconds per patient.

[13] On almost every occasion, physicians employed by Armstrong prescribed the same dosage units of the trinity drugs–90 Hydrocodone, 90 Soma, and 30 Xanax or Valium.

(5) prescriptions prepared in advance requiring only the doctor's signature; (6) phony pre-printed doctor's medical comments placed in patient files; (7) a lack of meaningful physical examination on initial and repeat visits;[14] (8) a lack of required documentation of a physical injury; (9) false documentation and outdated MRIs presented by patients and accepted by treating physicians who continued to dispense the trinity drugs; (10) sham physical therapy sessions;[15] (11) a cash-only payment policy; and (12) clinic-hopping among Armstrong's clinics.[16] Dr. Guenther also testified that each time he attempted to discuss clinic problems with Armstrong, such as the lack of physical therapy or clinic-hopping, Armstrong told him that she would "take care of it," although no changes were made, and on one such occasion Armstrong suggested Dr. Guenther simply "stop taking notes." Such evidence demonstrates conduct outside of the usual course of professional practice.

And although the Government failed to present expert testimony regarding the recognized practices of chronic pain management facilities, the jury did hear from fact witnesses about their discomfort with the clinics' operations. Dr. Hope Ewing testified that within an hour of meeting Armstrong about bringing her pain management patients to the clinics, she had a "strong feeling that this was not a suitable place for pain management," because she was

---

[14] DEA informant Nicole Buckeridge testified about her twenty visits to the clinic when she wore a recording device, and the grand jury heard the pertinent parts of her visits where practically no exam was conducted.

[15] Physical therapy sessions, if given, would last two to five minutes and consist of nothing more than sitting in a vibrating chair.

[16] Clinic-hopping effectively permitted patients to acquire a subsequent fourteen-day supply of the trinity drugs before their previous fourteen-day supply had run out.

told that she would have to see six to seven patients an hour, which she believed was insufficient for pain management. The Government also presented testimony of two physicians detailing the irregularities that caused them to stop working at the clinics. Dr. Michael Hunter, who quit after only a month at the clinics, stated that Armstrong told him that she gave prescriptions to patients because they expected to receive them. After seeing Armstrong in the parking lot exchanging money with a patient for whom he had refused to write a prescription, Dr. Hunter believed that patients were getting drugs without seeing a doctor. Dr. Gilbert Mason, who departed after six weeks, testified that he felt pressured by Armstrong to write prescriptions and to see more patients.[17]

Additionally, Dr. Cullins admitted at trial that she had: (1) made poor medical judgments; (2) identified patients as "clinic hoppers"; (3) issued multiple prescriptions for overlapping treatment periods to patients; (4) violated the Louisiana Pain Management Standards; and (5) been warned in March by Armstrong that the DEA might be sending in undercover agents since it had publicly shut down some other pain clinics. Despite having previously caught DEA informant Buckeridge "clinic hopping" and noting the word "jumper" multiple times in the clinics' files, Dr. Cullins continued to see Buckeridge and write her trinity drug prescriptions. Dr. Cullins even signed two post-dated prescriptions, seized from one of the pharmacies on April 11, 2005. The prescriptions purported to have been written April 23, 2005, but were filled by

---

[17] Armstrong relies on the two expert witnesses that she presented at trial who opined that her conduct was not outside the scope of professional pain management to argue that the jury could not have convicted her of illegal dispensation. Although an expert's opinion as to an ultimate fact issue may be helpful, the jury was instructed that it is not required to follow the opinions of the experts who testify. The defense presented its own expert testimony as to the appropriateness of the professional conduct at issue, and the jury was not persuaded.

the pharmacy on April 9, 2005. Further, an analysis of prescriptions written by Dr. Cullins was presented to the jury. It showed that Dr. Cullins was seeing and prescribing the trinity drugs for several hundred patients a day, with a high of 302 in one day. Although Dr. Cullins offered explanations for her conduct, the jury was entitled to reject most of her explanations.[18]

Yet Armstrong and Dr. Cullins contend that in this case expert testimony was necessary because the facts and circumstances surrounding the prescriptions could not establish that they acted outside the scope of professional practice in dispensing the controlled substances. Appellants' reliance on two cases from other circuits, United States v. Bek, 493 F.3d 790 (7th Cir. 2007), and United States v. Cuong, 18 F.3d 1132 (4th Cir. 1994), as support for this proposition is misplaced. In Bek, the Seventh Circuit addressed a sufficiency of the evidence challenge to convictions for illegally dispensing controlled substances to three deceased patients because they were unavailable to testify at trial. Bek, 493 F.3d at 799. That court reversed only one substantive count where the Government did not present expert testimony, medical records, or other evidence regarding the deceased patient's condition or the doctor's treatment of her. Id. In fact, the court recited the evidence presented that it considered sufficient to satisfy the criminal standard to convict a practitioner under § 841(a)(1), reflecting many of the same facts in the present case, such as uniform and careless medical exams and a disregard for signs of drug abuse. See

---

[18] Dr. Cullins was convicted on five substantive counts and acquitted on five others. Also, the jury was given a deliberate blindness instruction. To the extent that Dr. Cullins argues that she was unaware of certain practices at the clinics and that Armstrong failed to relay the warnings from patients' family members regarding drug addictions, the jury could have reasonably concluded that Dr. Cullins deliberately turned a blind eye to it all.

id. Similarly in Cuong, the Fourth Circuit reversed multiple § 841 convictions where the Government failed to present testimony from any of the patients to whom the illegal dispensations were made. 18 F.3d at 1142-43.

Thus, Bek and Cuong propose that evidence regarding the particular patient visit or treatment giving rise to the § 841 charge should be presented at trial in order for a conviction on the charge to withstand a motion for acquittal. See id. In this case, all of the substantive § 841 counts (counts 2-27) were based on occasions in which practitioners dispensed controlled substances to either DEA informant Buckeridge or undercover DEA Agent David Gauthreaux. Because both testified at trial as to each of their clinic visits and the treatment they received, recordings of the visits with Dr. Cullins were played for the jury, and medical records were introduced into evidence respecting counts 2-27, the reasoning of neither Bek nor Cuong would require acquittal.

Therefore, we are not persuaded that expert testimony was required to establish criminal liability on the facts of this case.

B. Non-Registrant's Guilt for Substantive Violations

Armstrong argues that counts 2-27 must fail because she is not registered to dispense controlled substances under the CSA and therefore cannot be held liable as a principal for substantively violating § 841. In response, the Government contends that the jury convictions should stand with Armstrong charged and convicted as both a principal and an aider and abetter. The Government also asserts that because Armstrong was a nurse during the conspiracy, she meets the definition of "practitioner" under the CSA and could be prosecuted for illegal dispensing without relying on the conduct of a registrant to establish liability.

1. Standard of Review

We review the sufficiency of an indictment de novo. United States v. Lucas, 516 F.3d 316, 342 (5th Cir. 2008). Again, we evaluate the sufficiency of evidence supporting a jury conviction by determining whether a rational jury, viewing the evidence in the light most favorable to the prosecution, could have found the essential elements of the offense to be satisfied beyond a reasonable doubt. See Miles, 360 F.3d at 476-77.

2. Discussion

Armstrong was indicted on twenty-six counts of substantively violating § 841 of the CSA. Specifically, it was charged that she, along with her clinics and pharmacies, aided and abetted by the registered physicians she employed, illegally dispensed controlled substances outside the scope of professional practice. Section 841 states: "Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally . . . to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." 21 U.S.C. § 841 (emphasis added). The basic proscription in § 841 applies to "any person" except those "authorized by this subchapter" such as physicians registered with the Attorney General pursuant to 21 U.S.C. § 822. The Supreme Court in United States v. Moore limited the scope of the § 841 exception by holding that an authorized physician who issues prescriptions outside the usual course of professional practice is subject to punishment under § 841(a)(1) just as any other "drug pusher." Moore, 423 U.S. 122, 138, 142-43 (1975). Thus, Armstrong contends that a charge for dispensing controlled substances outside the scope of professional practice only applies against registered physicians. Armstrong argues that because she was charged

with illegally dispensing, and she is not a physician registered under the CSA, the substantive counts of the indictment fail.

Armstrong argues that the law against dispensing applies only to registered physicians, citing United States v. Albert, 675 F.2d 712 (5th Cir. 1982). In Albert, this Court rejected the argument that laypersons could not conspire to dispense drugs illegally because they were not able to dispense drugs in the first instance, relying on the rule that a "person may be guilty of conspiring although incapable or committing the substantive offense." Id. at 715. Although this Court in Albert appeared to accept the assertion that the law against dispensing applies only to medical practitioners, id. ("the [co-conspirator laypersons] need not themselves be able to dispense drugs"), its dicta is not controlling. However, an examination of the CSA definitions of "dispense," "distribute," "practitioner," and "administer,"[19] causes us to reject the Government's assertion that Armstrong may be convicted as a principal under

---

[19] "Dispense" is defined as:

> to deliver a controlled substance to an ultimate user or research subject by, or pursuant to the lawful order of, a practitioner, including the prescribing and administering of a controlled substance and the packaging, labeling or compounding necessary to prepare the substance for such delivery. The term 'dispenser' means a practitioner who so delivers a controlled substance to an ultimate user or research subject.

21 U.S.C. § 802(10). In contrast, "distribute" means: "to deliver (other than by administering or dispensing) a controlled substance or a listed chemical." 21 U.S.C. § 802(11). "Practitioner" refers to "a physician . . . pharmacy . . . or other person licensed, registered, or otherwise permitted by the United States or the jurisdiction in which he practices or does research, to distribute, dispense, . . [or] administer . . . a controlled substance in the course of professional practice or research." § 802(21). Finally, "administer" means "the direct application of a controlled substance to the body of a patient . . . by – (A) a practitioner (or, in his presence, by his authorized agent), or (B) the patient . . . at the direction and in the presence of the practitioner . . . ." § 802(2).

§ 841. The logical reading of the statutory definitions of "dispense" and "distribute" that led this Court in United States v. Leigh to determine a doctor writing illegal prescriptions must be charged with dispensing rather than distributing, counsels that a non-registrant who does not write prescriptions but otherwise acts to provide drugs would not properly be charged with dispensing rather than distributing. See Leigh, 487 F.2d 206 (5th Cir. 1973) (holding reaffirmed by United States v. Harrison, 628 F.2d 929 (5th Cir. 1980)).

On each of the substantive counts, Armstrong was charged and convicted pursuant to both 21 U.S.C. § 841(a) and 18 U.S.C. § 2, as both a principal and an aider and abettor, or–the more correctly descriptive in this case–a commander or inducer. See Adam H. Kurland, To "Aid, Abet, Counsel, Command, Induce, or Procure the Commission of an Offense": A Critique of Federal Aiding and Abetting Principles, 57 S.C. L. Rev. 85, 87 (2005) (discussing the confusion caused by using the traditional phrase "aid and abet" to describe conduct captured by 18 U.S.C. § 2's extension of liability to those who cause illegal acts to be done). Section 2(b) states: "Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal." 18 U.S.C. § 2(b) (emphasis added). The historical and statutory note for § 2 further states that "[o]ne who puts in motion or assists in the illegal enterprise or causes the commission of an indispensable element of the offense by an innocent agent or instrumentality, is guilty as a principal even though he intentionally refrained from the direct act constituting the completed offense." Thus pursuant to § 2(b) Armstrong, a non-registrant, may be convicted for either "aiding and abetting" or "willfully causing" the dispensing of controlled substances beyond the scope

15

of professional practice. The evidence must prove that Armstrong had the mental state necessary to violate the underlying criminal statute and that she willfully caused another to commit the necessary act. See United States v. Levy, 969 F.2d 136, 141 (5th Cir. 1992) (noting that § 2(b) does not require shared criminal intent; only the defendant charged need have criminal intent, and the individual whom defendant caused to perform the criminal act may be innocent).

Because Dr. DeLoach and Dr. Guenther were charged with illegal dispensing but entered plea bargains with the Government and did not go to trial, Armstrong was convicted on twelve counts (counts 4, 6, 9-10, 12-13, 15-16, 19, 21, and 25-26) where the registrant who was charged was not tried. Examining the record, there is evidence sufficient for a rational jury to have convicted Armstrong for these counts under 18 U.S.C. § 2 regardless of whether a non-registrant may be convicted of illegally dispensing controlled substances.[20] See United States v. Neal, 951 F.2d 630, 633 (5th Cir. 1992) ("Aiding and abetting is not a separate offense, but it is an alternative charge in every indictment, whether explicit or implicit."); United States v. Smith, 584 F.2d 731, 734 (5th Cir. 1978) (stating that it is "beyond controversy, [that pursuant to § 2(b)] the accused may be convicted as causer, even though not legally capable of personally committing the act forbidden by a Federal statute"). The evidence supported a jury conclusion that the prescriptions in those counts were in fact issued without a legitimate medical purpose or beyond the scope of professional practice, and that Armstrong aided or induced the writing of such prescriptions.

---

[20] Armstrong's convictions for those counts (3, 5, 7, 8, 22 and 23) where the charged doctor (or in count 22, the charged pharmacy) was convicted present no issue because the jury convicted all charged with membership in the conspiracy and the district court gave the Pinkerton jury instruction regarding co-conspirators' liability for substantive counts.

More problematic are five additional counts (11, 14, 17, 20, and 27) where Armstrong was convicted but Dr. Cullins, the defendant physician, was tried and acquitted. The facts and proceedings of this case stands in contrast to United States v. Standefer, where the Supreme Court upheld petitioner's conviction for aiding and abetting even though the alleged principal had been acquitted. 447 U.S. 10, 25 (1980) (noting that symmetry of results may be intellectually satisfying but is not required). The principal had been acquitted in an earlier trial, and the jury instructions given in Standefer's trial required the jury to find his co-defendant guilty of the substantive offense in order to convict Standefer of aiding and abetting him. Id. at 13 n.6, 20 n.14.

Here, however, the same jury that convicted Armstrong considered the guilt of and acquitted Dr. Cullins. The jury concluded that there was at least reasonable doubt whether the prescriptions Dr. Cullins wrote on those five occasions were illegitimate. Thus, as to these counts, there was no crime for Armstrong to have abetted. See Standefer, 447 U.S. at 20 n.14 (distinguishing instant case, where the Government proved the co-defendant had committed the substantive violation, from cases holding that "there can be no conviction for aiding and abetting someone to do an innocent act") (citing Shuttlesworth v. Birmingham, 373 U.S. 262, 265 (1963)); cf. United States v. Yost, 24 F.3d 99, 104 (10th Cir. 1994) ("All that is required for a conviction based on 18 U.S.C. § 2 is a finding that the [defendant] aided someone in committing the crime."); United States v. Martin, 747 F.2d 1404, 1407 (11th Cir. 1984) (noting that one must "aid or abet or procure someone else to commit a substantive offense").

Even on a theory that Armstrong caused or induced  non-culpable Dr. Cullins to write the prescriptions, it is whether they were written "without a

legitimate purpose" or "outside the course of professional conduct" that differentiates dispensing from illegal dispensing. On these counts there is no evidence that Armstrong signed the prescriptions herself or otherwise was aware, even if Dr. Cullins was not, that there was no legitimate medical purpose for the prescriptions. Cf. Smith, 584 F.2d at 734 (holding that defendant could properly be convicted of failure to maintain records required of a licensed dealer, when he, a non-licensed employee of the dealer, knowingly sold and delivered firearms without noting the required personal information of the purchaser); also Cuong, 18 F.3d at 1142 ("A defendant is entitled to individual consideration of every count in an indictment by the jury and evidence sufficient to convict on each count beyond a reasonable doubt, if he is to be convicted.").

Considering that the jury found at least reasonable doubt that Dr. Cullins had issued the prescriptions other than for a legitimate medical purpose in the course of professional conduct, we find insufficient evidence for the jury to have reasonably concluded on these charges that they in fact were illegitimate prescriptions and Armstrong knew so.[21] Therefore, we reverse Armstrong's convictions for counts 11, 14, 17, 20, and 27.[22]

II. Jury Charges

Armstrong and Dr. Cullins both challenge the sufficiency of the jury instructions administered by the district court. Appellants argue that the

---

[21] We do not decide if a non-registrant who did attempt to write prescriptions would be liable for illegally dispensing as opposed to distributing. See United States v. Johnson, 831 F.2d 124 (6th Cir. 1987) (upholding conviction for distributing controlled substances by the issuance of prescriptions outside the usual course of medical practice, even though defendant was not a licensed physician).

[22] Because of our disposition of Armstrong's non-registrant arguments, we need not address her constitutional vagueness challenge to the substantive CSA counts.

instructions did not correctly state the law, instead allowing conviction based on a civil negligence standard and exposing Appellants to criminal conviction for malpractice. Specifically, Appellants challenge the district court's instruction to the jury that it could find them guilty of violating 21 U.S.C. § 841 if they prescribed controlled substances either without a valid medical purpose or beyond the scope of professional practice. They assert that this disjunctive standard effectively permitted conviction for negligence because it eliminated the mens rea of the crime–"lack of a legitimate medical purpose"–and eviscerated any good faith defense that Armstrong mounted. Finally, Dr. Cullins argues that the good faith instruction did not cure the district court's refusal to charge in the conjunctive because (1) it applied only the substantive counts and not to the conspiracy, and (2) it was couched as a defense rather than as an element of the Government's case.

In response, the Government argues that the instructions, taken as a whole, properly apprised the jury of the applicable law. The Government asserts that this Court has sustained illegal dispensing convictions using similar phraseology adopted by the district court in this case. The Government points to the fact that nowhere in the plain text of the three provisions that govern the dispensing of controlled substances, 21 U.S.C. §§ 841 and 822(b) and 21 C.F.R. § 1306.04, is there a double statutory element permitting conviction only if a prescription is issued for both no "legitimate medical purpose" and also outside the "usual course of professional practice". The Government also notes that many courts, including the Fifth Circuit in United States v. Fuchs, 467 F.3d 889 (5th Cir. 2006), have recognized that the two clauses "legitimate medical

purpose" and "usual course of professional conduct" are often used interchangeably.[23]

Finally, the Government notes that Dr. Cullins did not object to the good faith jury instruction below, and that the instruction, which mirrored a good faith instruction approved by this Court's precedent, was not in plain error. Moreover, the Government contends that because the jury charge properly linked the substantive § 841 instruction back into the instruction for conspiracy, the good faith charge in the former was legally sufficient.

A. Standard of Review

A properly objected-to instruction is reviewed for abuse of discretion. Fuchs, 467 F.3d at 900. Whether an instruction misstated an element of a statutory crime is reviewed de novo. United States v. Guidry, 406 F.3d 314, 321 (5th Cir. 2005) (citation omitted). In conducting that review, this Court "consider[s] whether the jury instruction, taken as a whole, is a correct statement of the law and whether it clearly instructs jurors as to the principles of the law applicable to the factual issues confronting them." Guidry, 406 F.3d at 321 (emphasis added).[24] A single instruction to a jury should not be judged

---

[23] Armstrong also argues that the statute is ambiguous and thus the rule of lenity requires the court to adopt the narrowest reading of the criminalized conduct, the conjunctive liability instruction. The CSA provides a clear standard of liability, making the rule of lenity inapplicable. Further, the rule of lenity has been routinely rejected in prosecutions under the CSA. See Gore v. United States, 357 U.S. 386, 391 (1958).

[24] This standard guides our analysis of an appeal for failure to give defendant's requested instruction as well as what jury instruction the district court did give. United States v. Simmons, 374 F.3d 313, 319 (5th Cir. 2004) (appeal for failure to give defendant's requested defense theory instruction reviewed for whether the court's charge, as a whole, was correct statement of law and clearly instructed jurors as to the principles of law applicable to the factual issues confronting them); but see United States v. Nguyen, 493 F.3d 613, 623 (5th Cir. 2007) (reviewing a district court's refusal to include a defendant's proposed jury instruction in

in isolation. Id. Any error in the jury instruction is subject to harmless error review. United States v. Patterson, 431 F.3d 832, 837 (5th Cir. 2005); see FED. R. CRIM. P. 52(a) (standard for harmless error review).

The failure to object timely to a jury instruction is subject to plain error review. See Fuchs, 467 F.3d at 901 (the court will reverse only if (1) there was an error, (2) that was clear and obvious, and (3) that affected the defendant's substantial rights causing a miscarriage of justice).

B. Discussion

Although a close question, the complete context of the jury charge properly apprised the jurors of the correct legal standards and burdens to be met by the prosecution. For the reasons discussed below, based on the relevant statutory language, regulation, Moore, and Fifth Circuit precedent, we conclude that these jury instructions, taken as a whole, provided a correct statement of the law.[25]

To convict the defendants of illegally dispensing controlled substances in violation of 21 U.S.C. § 841(a)(1), the Government was required to prove "(1) that [they] . . . dispensed a controlled substance, (2) that [they] acted knowingly and intentionally, and (3) that [they] did so other than for a legitimate medical purpose and in the usual course of [ ] professional practice." United States v.

---

the charge for abuse of discretion). The inquiry is whether the jury charge, as a whole, correctly and clearly instructed the jurors as to the law and issues before them.

[25] Appellants assert that Fifth Circuit case law requires this "legitimate medical purpose" element under United States v. Rosen, 582 F.2d 1032 (5th Cir. 1978) ("To convict [the defendant doctor], it was necessary for the government to prove (1) that he distributed or dispensed a controlled substance, (2) that he acted knowingly and intentionally, and (3) that he did so other than for a legitimate medical purpose and in the usual course of his professional practice.") (emphasis added)). This argument is unpersuasive. See Fuchs, 467 F.3d at 900-01 (reviewing for plain error and holding there is no clearly established Fifth Circuit law requiring that the Government prove no "legitimate medical purpose" in a § 841(a)(1) prosecution).

Norris, 780 F.2d 1207, 1209 (5th Cir. 1986) (quoting United States v. Rosen, 582 F.2d 1032, 1033 (5th Cir. 1978)). The third element is not expressly required by the text of § 841, but relevant regulations provide that a controlled substance can be dispensed by a prescription "issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." 21 C.F.R. § 1306.04(a).

The Supreme Court held in Moore, 423 U.S. at 138-43, that a registered physician could be charged and convicted under § 841 of the CSA for drug trafficking. Although the precise elements of a § 841 offense were not expressly addressed in Moore, the Supreme Court rejected the "suggest[ion] that if a registrant could be reached under § 841, he could not be prosecuted merely because his activities fall outside the 'usual course of practice.'" Id. at 139. Under the Harrison Act, the predecessor to the CSA, "[p]hysicians who stepped outside the bounds of professional practice could be prosecuted," id. at 132, and because Congress intended the CSA to strengthen rather than weaken prior drug laws, a defendant physician could still be convicted under § 841 for conduct that exceeded the bounds of professional practice. Id.

Moreover, a logical reading of 21 C.F.R. § 1306.04, the applicable regulation, shows that liability is not conjunctive. See United States v. Hayes, 595 F.2d 258, 289 (5th Cir. 1979) (stating that § 1306.04 defines the circumstances in which a registrant may be held to have violated the proscription against manufacturing, distributing, or dispensing a controlled substance contained in 21 U.S.C. § 841). The regulation states that for a "prescription for a controlled substance to be effective[, it] must be issued for a legitimate medical purpose by an individual practitioner acting in the usual

22

course of his professional practice." 21 C.F.R. § 1306.04. Both prongs are necessary for a prescription to be legitimate; one is not sufficient. Id. The logical converse is that a practitioner is unauthorized to dispense a controlled substance if the prescription either lacks a legitimate medical purpose or is outside the usual course of professional practice. See id.; see also United States v. Nelson, 383 F.3d 1227, 1233 (10th Cir. 2004) (holding that the converse of the affirmative requirement of a medical purpose in usual course of practice would be if either was missing, not if both were missing). In other words, knowingly distributing prescriptions outside the course of professional practice is a sufficient condition to convict a defendant under the criminal statutes relating to controlled substances.[26]

Specifically in the instant case, the district court instructed the jury in relevant part that:

> the defendants are charged with multiple violations of [§ 841(a)(1)] and [18 U.S.C. § 2], which provide that it is unlawful for any person knowingly or intentionally to illegally dispense controlled substances not for a legitimate medical purpose or outside the usual course of professional practice . . . .
>
> In order for you [sic] find each of the defendants guilty . . . the government would have to prove the following elements beyond a reasonable doubt as to each count . . . [f]irst, that the physician

---

[26] In Gonzales v. Oregon, the Supreme Court determined that § 1306.04 "does little more than restate the terms of the statute itself." 546 U.S. 243, 257 (2006) (holding that the CSA did not authorize the Attorney General to prohibit doctors from prescribing regulated drugs for use in physician-assisted suicide). The "regulation uses the terms 'legitimate medical purpose' and 'the course of professional practice,' but this just repeats two statutory phrases and attempts to summarize the others." Id.; see 21 U.S.C. § 802(21) (using the phrase "in the course of professional practice" as part of the definition of "practitioner"); see 21 U.S.C. § 830(b)(3)(A)(ii) (reporting provision of CSA defines "valid prescription" as one that is issued "for a legitimate medical purpose by an individual practitioner . . . acting in the usual course of the practitioner's professional practice").

23

prescribed or dispensed the controlled substance alleged in the indictment; [s]econd, that the physician did so knowingly and intentionally; and [t]hird, that the physician prescribed or dispensed the controlled substance either without a legitimate medical purpose or outside the course of his or her professional practice.

The district court then explained that for a prescription to be authorized under the CSA,

> it must be issued for a legitimate medical purpose by an individual acting in the usual course of his or her professional practice. Thus, the final element the government must prove beyond a reasonable doubt, is either that the physician prescribed or dispensed the drug other than for a legitimate medical purpose or that the physician dispensed the drug not in the usual course of medical practice.
>
> A controlled substance is prescribed by a physician in the usual course of professional practice, and therefore, lawfully, if the substance is prescribed by him or her in good faith, medically treating a patient in accordance with a standard of medical practice generally recognized and accepted in the United States. Good faith in this context means an honest effort to prescribe for a patient's condition in accordance with the standards of medical practice generally recognized or accepted in this country.

(emphasis added). The district court then explicitly highlighted the broad discretion afforded doctors in their medical practice:

> In making a medical judgment concerning the right treatment for an individual patient, physicians have discretion to choose among a wide range of available options. Therefore, in determining whether the defendant acted without a legitimate medical purpose, you should examine all of the physician's actions and the circumstances surrounding them.

(emphasis added). This language describes lawful conduct as including a doctor's intentional effort to prescribe for the purpose of treating a patient's condition. As such, the district court essentially defined conduct "in the usual

24

course of professional practice" as conduct that is intended "for a legitimate medical purpose." Our reading of the jury charge is bolstered by the immediately following section of instruction, which, including factors identified in Rosen, 582 F.2d at 1036, and subsequent case law, lists several examples of the "[t]ypes of behavior from which you [the jury] could infer that the physician was acting without a legitimate medical purpose or outside the usual course of professional practice." That the district court instructed that the same behavioral examples could support a conclusion that a doctor acted either outside the scope of professional practice or without a legitimate medical purpose indicates that the phrases, although listed disjunctively, were considered interchangeable.

The jury instructions in this case reflect previously approved instructions. Implicit in the Supreme Court's reasoning in Moore is the acceptance of the single prong of "outside the scope of a professional practice." See Moore, 423 U.S. at 138-43. It also suggested the propriety of a jury instruction stating that the defendant could be found guilty if the jury found beyond a reasonable doubt that he dispensed the controlled substance "other than in good faith for detoxification in the usual course of a professional practice and in accordance with a standard of medical practice generally recognized and accepted in the United States." Id. at 139 (emphasis added). Notably, while the jury instructions were not the issue directly before the Moore court, they did not include the requirement that the Government prove beyond a reasonable doubt that the physician prescribed the controlled substance other than for a legitimate medical purpose. Id.

In holding that the law requires an objective standard to determine what constitutes the "usual course of professional practice," this Court's dicta in

Norris, 780 F.2d at 1209, commented that an instruction to the jury to consider "[w]hether [defendant] prescribed the drugs for what he subjectively considered a legitimate medical purpose" was a "correct statement of law." Id. What the Norris court refers to as the instruction requiring "what he subjectively considered a legitimate medical purpose" was that it was prescribed "lawfully, if the substance is prescribed by him in good faith." Id. at n.2. Furthermore, Norris approved jury instructions substantially the same as those in this case. See Norris, 780 F.2d at 1209 n.2 (containing language identical to the good faith instruction given by the district court at Armstrong's trial).[27]

In Fuchs, the defendant pharmacist challenged his convictions for dispensing a controlled substance not in the usual course of professional practice in violation of § 841(a)(1) based on the ground that "the government was required to prove not only that he dispensed controlled substances outside the usual course of professional practice but also that he did so without a legitimate medical purpose." Fuchs, 467 F.3d at 899. Neither the indictment nor the jury instructions in Fuchs referred to "legitimate medical purpose." Id. Under plain error review, the court did not find the instructions problematic, recognizing that this circuit's previous case law listed as a single element of a § 841(a)(1) offense that the dispensing be done "other than for a legitimate purpose and in the usual course of his professional conduct." Id. (citing Rosen, 582 F.2d at 1033). The court in fact recognized that the phrases "without a legitimate medical reason" and "beyond the course of professional practice" have been used interchangeably.

---

[27] Moreover, because the jury charge properly linked the substantive § 841 instruction back into the instruction for conspiracy, the good faith charge in the former was legally sufficient. The jury had to find that Armstrong and Dr. Cullins knew the unlawful purpose and joined in the conspiracy with the intent to further the unlawful purpose.

Id. (citing United States v. Outler, 659 F.2d 1306, 1308-09 (5th Cir. 1981) ("[A] physician may be charged with a criminal violation of § 841(a) . . . whenever he or she prescribes a controlled substance without a legitimate medical reason . . . [T]he qualifying condition of the offense, i.e., the element of behavior beyond professional practice . . . .")). Thus, relying on Moore, the Fuchs court concluded that "[u]nder current law, a medical professional 'can be prosecuted under § 841 when [his] activities fall outside the usual course of professional practice.'" Fuchs, 467 F.3d at 901 (quoting Moore, 423 U.S. at 124)).

Finally, looking to the holdings of other circuits that have addressed this question, we find additional support for upholding the jury instructions in this case. The Tenth Circuit addressed similar arguments in United States v. Nelson, 383 F.3d 1227, 1230-33 (10th Cir. 2004). The Nelson court found Moore controlling on the point of whether a disjunctive jury instruction properly stated the law,[28] and relied on Moore and § 1306.04 to hold that the phrases may be listed in the disjunctive in the trial court's jury charge. See also United States v. Bek, 493 F.3d 790, 798 (7th Cir. 2007) (approving disjunctive jury instructions; noting Government, to convict practitioner, must prove he prescribed controlled substances outside course of professional practice; opinion does not state that the prosecution must also prove that it was without legitimate medical purpose); United States v. Limberopoulos, 26 F.3d 245, 249-50 (1st Cir. 1994) (finding that "well-established case law mak[es] clear that the statute [§ 841] applies to a pharmacist's (or physician's) drug-dispensing activities so long as they fall outside the usual course of professional practice."). In addition, the Fourth

---

[28] The Nelson court recognized that the issue of disjunctive jury instructions was "not the precise focus of [the Moore] opinion," but found Moore's discussion of jury instructions in the case to be part of the careful, central analysis of the opinion. Nelson, 383 F.3d at 1232.

Circuit has stated that requiring the prosecution to prove that the defendant physician acted "for other than a legitimate medical purpose . . . plac[es] an even heavier burden on the government than otherwise required to establish criminal liability." United States v. McIver, 470 F.3d 550, 559 (4th Cir. 2006) (citing United States v. Alerre, 430 F.3d 681, 690-91 (4th Cir. 2005); Cuong, 18 F.3d at 1138).

Appellants urge this court to instead adopt the reasoning of the Ninth Circuit in United States v. Feingold, 454 F.3d 1001 (9th Cir. 2006). That court determined that "outside the scope of professional practice" was a mere malpractice standard and that even intentional malpractice would be inconsistent with Moore's description of a doctor violating § 841(a) as one acting as a drug pusher rather than a physician. Id. at 1010. Rather, the Feingold court asserted that Moore requires that a doctor's actions must completely betray any semblance of legitimate medical treatment, and thus criminal liability requires the higher showing that "the practitioner intentionally has distributed controlled substances for no legitimate medical purpose and outside the usual course of professional practice." Id. (emphasis added). The court continued by stating that the jury instructions cited and implicitly accepted in Moore, as well as § 1306.04, support its interpretation of that standard. Id. at 1010-11. We are not persuaded by the reasoning of the Ninth Circuit in Feingold. As discussed, the jury instructions implicitly approved by Moore exclude any reference to medical purpose, and a logical reading of § 1306.04 supports the use of the disjunctive standard. Further, Feingold merely includes the language of the jury instruction cited in Moore followed by a conclusory statement that it "indicates that the jury could convict under § 841(a) if the

28

government proved that the practitioner intentionally prescribed drugs for no legitimate medical purpose."[29]  Id.

Armstrong and Dr. Cullins also argue that the legitimate medical purpose prong encompasses the necessary mens rea element of a § 841 offense, and without it, the doctor will be criminally convicted for malpractice.  Appellants are mistaken.  The mens rea of a § 841 offense is encompassed in the second and third element of the crime - whether the practitioner intentionally dispensed controlled substances without a legitimate medical purpose or outside the scope of professional practice.  See Nelson, 383 F.3d at 1232-33.  The charge as a whole in this case, including the good faith instruction, and instruction on the discretion afforded to doctors, made it clear that the jury had to make a finding with respect to Appellants' state of mind.  These instructions distinguish a § 841 prosecution from a mere civil malpractice suit where a plaintiff may prevail regardless of a defendant doctor's good faith intent to act within the scope of medical practice.  See McIver, 470 F.3d at 559-60 (finding that good faith is not a defense to a claim of medical malpractice) (citations omitted).  Furthermore, the standard of proof–beyond a reasonable doubt–additionally protects practitioners from being exposed to criminal convictions on a mere civil standard.  See United States v. Vamos, 797 F.2d 1146, 1153 (2d Cir. 1986) (rejecting the assertion that the jury instructions in that case exposed the defendant to criminal liability for nothing more than mere malpractice by pointing out that "in a criminal prosecution [a defendant] may be found guilty

---

[29] Feingold interprets the instruction in Moore, which refers to acting outside the scope of recognized professional practice, as including the requirement of "other than for a legitimate medical purpose." Feingold, 454 F.3d at 1010-11.  This implies, as other cases have explicitly noted, that the phrases are understood interchangeably.  See Nelson, 383 F.3d at 1231.

only upon proof beyond a reasonable doubt that he acted outside the scope of medical practice").

Finally, Armstrong and Dr. Cullins also argue that the jury instruction regarding expert testimony compounded the error in instructing the jury that a finding of conduct outside the usual course of professional practice sufficed to convict under § 841.[30] They did not object below, and we find no clear error in the instruction.

Taken as a whole, the jury charge was a correct statement of law and correctly presented the issues to the jury.[31]

## CONSPIRACY TO COMMIT MONEY LAUNDERING

I. Evidentiary Issues

---

[30] The district court instructed the jury that:

> Expert testimony is not always required to show that a physician is not acting for a legitimate medical purpose or in the usual course of his or her professional practice. If any expert testimony is offered, you are not bound by the expert testimony, and you may instead consider all the facts and circumstances surrounding the defendants' prescribing practices as presented to you by other evidence in the case.

[31] Dr. Cullins also asserts that this court should adopt "no legitimate medical purpose" as a separate element of the § 841 offense because Congress intended that conduct violating § 841 be more egregious than that violating § 842. However, whether a defendant's conduct precipitating a prosecution under § 841 also violates § 842 is not relevant. Moore, 423 U.S. at 134-38 (finding nothing in the statutory scheme or legislative history justifying a conclusion that a registrant who may be prosecuted for the relatively minor offense of violating § 829 [i.e., a § 842 offense] is exempted from prosecution under § 841 for the greater offense of acting as a drug "pusher"). Further, writing prescriptions without a legitimate medical purpose would also violate § 842 because the relevant language in 21 C.F.R. § 1306.04 applies to both provisions. See id. at 137 n.13.

Armstrong asserts that the district court abused its discretion by permitting the Government, through its cross-examinations and closing arguments, to argue to the jury that Armstrong and the Corporate Defendants under-reported their taxable income. Armstrong claims that the Government attempted to show that tax evasion was a motive for the alleged concealment of income, despite the Government's admission before trial that it had no evidence of tax evasion. Armstrong contends that the jury's verdict was tainted as a consequence. The Government responds that the questioning at issue, regarding the source of Armstrong's unaccounted-for seized cash, was relevant to the conspiracy to commit money laundering and to rebutting tax arguments initiated by defense counsel. The Government further argues that there was no harm because of its statement to the jury in closing argument that this was not a tax case and the court's instruction to the jury that the statements of attorneys were not evidence.

The standard of review for alleged prejudicial admission of evidence is abuse of discretion. United States v. Acosta, 763 F.2d 671, 693 (5th Cir. 1985). While a district court has broad discretion regarding its decisions on both the relevancy and admissibility of evidence, "evidence in criminal trials must be strictly relevant to the particular offense charged." United States v. Hays, 872 F.2d 582, 587 (5th Cir. 1989) (quoting Williams v. New York, 337 U.S. 241, 247 (1949)) (internal quotations omitted).

Armstrong initiated the issue of her tax reporting in an effort to establish her credibility. In opening statements, Armstrong's counsel informed the jury of the substantial taxes that Armstrong paid from her clinics' earnings, in an admitted attempt to undercut any prosecution argument that the clinics had

concealed their income. The Government objected that "this is not a tax case." However, when the Government attempted to question Armstrong's Certified Public Accountant about whether certain sums of clinic income were accounted for, Armstrong in turn objected. In so doing, counsel admitted putting Armstrong's tax payments at issue but argued that it was inappropriate for the Government to continue questioning on the subject as it was not a tax evasion case. The district court overruled Armstrong's objection to the questioning.

The issue of whether Armstrong paid all income tax due was introduced to the case by Armstrong. The Government was eliciting evidence both for its case in chief, by demonstrating the possible concealment of income, as well as rebutting the defense argument that all taxes had been paid. The record shows that the district court rejected Armstrong's objections to these questions after a proper balancing of the appropriate factors under Rules 401 to 403 of the Federal Rules of Evidence. Such questioning both went to the Government's case in chief, because it addressed concealment and money laundering, and to challenge the defense explanation that defendants had reported all of the income. The court noted that the Government's analysis of Armstrong's earnings revealed a substantial cash stream, and evidence admitted at trial revealed a lack of accountability of funds earned during the period of time in which the conspiracy operated and showed that cash was used in multiple financial transactions with no identifiable source. The district court did not abuse its discretion by overruling the objection from Armstrong's counsel and allowing the prosecution to cross-examine Armstrong's accountants regarding whether Armstrong's income was greater than the defense alleged.

Armstrong also challenges certain prosecution statements made during closing arguments. Because Armstrong did not object to the comments at trial,

we review them for plain error. United States v. Burns, 526 F.3d 852, 858 (5th Cir. 2008). Plain error exists if (1) there was error; (2) the error was clear and obvious; and (3) the error affected a substantial right. Id.

Specifically, during its closing argument, the prosecution – after clearly stating that the case was about illegal dispensing, not about tax – then proceeded to speculate, from the daily receipts in evidence from one month in 2005 of over $20,000 income per day, as to an annual income that was $1.6 million greater than that reported by Armstrong and her husband for the relevant year, questioning the source of the extra income. Viewing the comments of the prosecutor in the context of the entire trial, including the tax arguments presented by defense counsel to which it responded, and the court's cautionary instruction to the jury that attorneys' statements were not evidence, the prosecutor's comments in closing argument do not constitute plain error. See Burns, 526 F.3d at 858; United States v. Thomas, 12 F.3d 1350, 1367-68 (5th Cir. 1994).

II.  Sufficiency of the Evidence

Armstrong contends that there was insufficient evidence supporting her conviction for count 28, conspiracy to commit money laundering, because the evidence did not prove that funds were concealed for an ill–designed purpose. On count 28 of the superseding indictment Armstrong and the Corporate Defendants were charged and convicted with conspiracy to launder money in

violation of §§ 1956(a)(1)(A)(I)[32] ("promotional money laundering"), (a)(1)(B)(I)[33] ("concealment money laundering"). Crucially, Armstrong does not challenge the sufficiency of evidence presented at trial supporting a conviction for conspiring to commit money laundering in violation of § 1956(a)(1)(A)(I) ("promotional money laundering").

To sustain a conviction for conspiracy to launder money under § 1956(h), the Government must prove beyond a reasonable doubt that: (1) there was an agreement between two or more persons to launder money; (2) the defendant voluntarily agreed to join the conspiracy; and (3) one of the persons committed an overt act in furtherance of the conspiracy. United States v. Wilson, 249 F.3d 366, 379 (5th Cir. 2001) (citation omitted). The text of § 1956(h) and the district court's jury charge plainly instruct that the Government only needs to prove a voluntary agreement and an overt act in furtherance of either promotional money laundering or concealment money laundering in order for the jury to convict Armstrong on count 28.[34] The Government was not required to prove a conspiracy to commit both types of money laundering. Thus, even if we agreed with Armstrong that there was insufficient evidence of a conspiracy to commit

---

[32] Section 1956(a)(1)(A)(I), ("promotional money laundering"), makes it a crime to: (1) conduct or attempt to conduct a financial transaction, (2) which the defendants knew involved the proceeds of unlawful activity, and (3) with the intent to promote or further unlawful activity. United States v. Miles, 360 F.3d 472, 477 (5th Cir. 2004).

[33] Section 1956(a)(1)(B)(I), ("concealment money laundering"), makes it a crime for anyone to knowingly use the proceeds of certain illegal activity to conceal or disguise the nature, location, source, ownership, or control of such proceeds. United States v. Burns, 162 F.3d 840, 847 (5th Cir. 1988).

[34] Section 1956(h) states that "[a]ny person who conspires to commit any offense defined in this section . . . shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy." 18 U.S.C. § 1956(h) (emphasis added).

concealment money laundering, we could not reverse the conspiracy conviction in count 28, because the unchallenged evidence supports the verdict of a conspiracy to commit promotional money laundering. Armstrong's conviction on count 28 is affirmed.

## DR. CULLINS'S SENTENCING

Dr. Cullins challenges the reasonableness of her sixty-month sentence, arguing that the trial court erred in calculating an initial Sentencing Guidelines range of forty-one to fifty-one months because it improperly included legitimate prescriptions and drugs dispensed by the clinics before she began working there. Dr. Cullins further argues that her sentence is unreasonable because it is disproportionate to her culpability, particularly in light of Armstrong's seventy-month sentence.[35]

The Government responds that Dr. Cullins did not object to the factual findings in the Presentence Investigation Report ("PSR"), which was adopted by the district court. The Government asserts that the base offense level calculated by the district court was correct and that a mere difference of sentences among co-defendants does not constitute an abuse of discretion.

1. Standard of Review

The review of sentencing decisions is limited to determining whether they are "reasonable." Gall v. United States, 128 S. Ct. 586, 594 (2007). That process of review is a bifurcated one. Id. We first examine whether the district court

---

[35] Dr. Cullins also appeals her sentence insofar as it is based on conduct of which she was acquitted, which she argues violated her Sixth Amendment right to a jury trial. This argument is foreclosed by United States v. Valdez, 453 F.3d 252, 264 (5th Cir. 2006) (holding that acquitted conduct can be considered at sentencing if proven by a preponderance of the evidence), cert. denied, 127 S. Ct. 456 (2006).

committed any significant procedural error, such as: (1) failing to calculate (or improperly calculating) the applicable Guidelines range; (2) treating the Guidelines as mandatory; (3) failing to consider the 18 U.S.C. § 3553(a) factors;[36] (4) determining a sentence based on clearly erroneous facts; or (5) failing to adequately explain the chosen sentence, including an explanation for any deviation from the Guidelines range. Id. at 597. Analyzing for procedural error, the reviewing court examines the district court's interpretation or application of the Sentencing Guidelines de novo, and its factual findings for clear error. United States v. Cisneros-Gutierrez, 517 F.3d 751, 764 (5th Cir. 2008). "There is no clear error if the district court's finding is plausible in light of the record as a whole." Id. (quoting United States v. Juarez-Duarte, 513 F.3d 204, 208 (5th Cir. 2008)).

Next, assuming the district court's decision is procedurally sound, we consider the substantive reasonableness of the sentence. Gall, 128 S. Ct. at 597. While a sentence within a properly-calculated Guidelines range enjoys a presumption of reasonableness in this Circuit, Cisneros-Gutierrez, 517 F.3d at 766, a sentence that includes an upward or downward departure as allowed by the Guidelines is reviewed for an abuse of discretion. See Gall, 128 S. Ct. at 597 (holding that absent a presumption of reasonableness, abuse of discretion is the standard for reviewing sentences, whether Guideline or non-Guideline, for substantive reasonableness). That the Court of Appeals "might reasonably have concluded that a different sentence was appropriate" is an insufficient

---

[36] Section 3553(a) lists seven factors that a sentencing court shall consider, preceded by a general directive to "impose a sentence sufficient, but not greater than necessary, to comply with the [general purposes of sentencing]." See § 3553(a) (2000 ed., Supp. V); Gall, 128 S.Ct. at 596 n.6.

justification for reversal of the district court, because the sentencing judge is in a superior position to evaluate the § 3553(a) factors, given that "[t]he judge sees and hears the evidence, makes credibility determinations, has full knowledge of the facts and gains insights not conveyed by the record." Gall, 128 S. Ct. at 597 (internal quotations omitted).

2. Analysis

A district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. Gall, 128 S. Ct. at 596. At the sentencing hearing, the district court adopted the factual findings of the Pre-Sentencing Report (the "PSR"). Dr. Cullins stated that she had no objections to those findings. The PSR stated that the usual prescription given to the clinics' patients generally included three medications in the following dosage units for a fourteen day period: 90 Lorcet;[37] 30 Xanax;[38] and 90 Soma.[39] The PSR also stated that: (1) on most occasions, each doctor at the clinics often saw more than eighty patients per day; (2) for certain doctors, that number of patients increased to hundreds per day; and (3) at times the doctors, on average, saw one patient every 3.3 minutes. The PSR specifically noted that Dr. Cullins was known as the "in and out" lady because she wrote prescriptions so fast.[40]

---

[37] Lorcet's generic equivalent is Hydrocodone, a Schedule III controlled substance.

[38] Xanax's generic equivalent is Alprazolam, a Schedule IV controlled substance.

[39] Soma's generic equivalent is Carisprodol, an uncontrolled substance.

[40] For example, it was noted in the PSR that on one day, Dr. Cullins saw 262 patients within a six-hour timespan; that on many days, Cullins saw a patient every one to two minutes; and that she prescribed more medications than the other two physicians indicted, Dr. Guenther and Dr. DeLoach.

The PSR calculated Dr. Cullins's base offense level as 20, pursuant to United States Sentencing Guidelines § 2D1.1(a) and (c)(10), based on her responsibility in dispensing more than 40,000 dosage units of a Schedule III substance. To find that Dr. Cullins, or her co-conspirators, illegally prescribed 40,000 dosage units requires finding 445 or more patient visits accompanied by illegal Hydrocodone dispensations of typical dosage. At the rate that Dr. Cullins and the other physicians wrote these prescriptions, it would take only six days for one doctor at the clinic, seeing approximately 80 patients per day, to dispense that amount of Hydrocodone. The evidence shows that Dr. Cullins wrote 302 such prescriptions in four hours of work at one clinic on April 9, 2005. In light of the fact that Dr. Cullins worked at the clinic for over two years, was found guilty of a conspiracy to dispense controlled substances, the district court's finding that at least 40,000 illegally dispensed doses of a Schedule III drug were attributable to Dr. Cullins was plausible and did not constitute clear error.[41] See United States v. Carbajal, 290 F.3d 277, 287 (5th Cir. 2002) (applying the general rule that information in a PSR is presumed reliable and may be adopted by the district court without further inquiry if the defendant fails to demonstrate by rebuttal evidence that the information is untrue or unreliable).

We conclude that the district court committed no procedural error in determining Dr. Cullins's sentence. The Guidelines sentence range was correctly calculated,[42] and a review of the sentencing hearing transcript clearly shows that

---

[41] Dr. Cullins's contention that she was held responsible for the same quantity of illegally dispensed drugs as Armstrong because they shared the same base offense level is erroneous. Armstrong also had a base offense level of 20, but the relevant provision § 2D1.1(c)(1) refers to "40,000 or more units of Schedule III substances."

[42] Dr. Cullins does not object to the two-level increase for her role in the offense, which created a total offense level of 22. Combined with a criminal history category of I, the

the district court did not treat the Guidelines as mandatory, and that it considered the § 3553(a) factors, gave an individualized assessment, and adequately explained the chosen sentence, including an explanation for imposing an upward departure from the Guidelines range.

We now turn to Dr. Cullins's argument that her sentence was nonetheless substantively unreasonable, particularly in comparison to the sentence meted out to Armstrong. Cullins argues, based on the proportionality principle of 18 U.S.C. § 3553(a)(6), that she should have been given a shorter sentence because Armstrong was more culpable and received a sentence only ten months longer. Reviewing the reasonableness of the sentence imposed by the district court, an upward departure from the initial calculation of a Guidelines range, we do not find it to be abuse of discretion. See Smith, 440 F.3d at 707.

At the sentencing hearing, the court noted the substantial number of letters received on Dr. Cullins's behalf and heard defense counsel describe Dr. Cullins's years of service as a doctor and lay minister. Acknowledging these mitigation arguments, the district court discussed Dr. Cullins's position of trust as a doctor and the special role that doctors have in society, tending to people when they are vulnerable, and starting with the command to do no harm. Finding that Dr. Cullins's conduct in her two years at the clinic violated this command and trust, the district court concluded that her patients and society had a right to expect better. The district court agreed with the Government that the trial testimony and facts of the case revealed substantial harm to individual victims and the public's faith in the healthcare delivery system. After this careful considered Cullins's conduct and the relevant § 3553(a) factors, the district court

recommended Guidelines range was forty-one to fifty-one months in prison.

imposed a sentence of sixty months, an upward departure from the Guidelines range but within the statutory range.

Nonetheless, Cullins argues that her sixty-month sentence is excessive in relation to Armstrong's seventy-month sentence, and therefore that the district court failed to consider the need to avoid unwarranted sentencing disparities. See § 3553(a)(6). Dr. Cullins is correct that identifying "a case in which a similarly-situated defendant received a lesser sentence" is one way that a defendant can establish the existence an unwarranted disparity. See Smith, 440 F.3d at 709. However, we are not persuaded that the comparison of the co-defendants' sentences in this case shows an abuse of discretion. Armstrong, the acknowledged mastermind, did receive a longer sentence that Dr. Cullins. Dr. Cullins contends that her conduct was less egregious than Armstrong's and warrants a greater sentencing differential than the ten-month difference in length between Armstrong's sentence and her own. The district court correctly noted that Armstrong is a non-registrant and could not have carried out the enterprise without doctors like Dr. Cullins who worked at the clinics and wrote all of the prescriptions.

Dr. Cullins has not demonstrated that, considering this significant difference in situation between the defendants, the sentence imposed is disproportionate to her culpability such that the district court abused its discretion. See Cisneros-Gutierrez, 517 F.3d at 767 (rejecting argument that defendant's sentence was unreasonable because his brother, more deeply involved in the conspiracy, received a sentence ten years shorter, noting: "Defendant also fails to consider that his microcosmic approach to sentencing disparities, while

40

relevant, would create its own set of disparities with other similarly situated defendants.").

## CONCLUSION

For these reasons, Dr. Cullins's convictions and sentencing are AFFIRMED, Armstrong's convictions for counts 11, 14, 17, 20, and 27 are REVERSED, her remaining convictions are AFFIRMED, and the case is REMANDED to the district court for further proceedings.